Jyotin Hamid (jhamid@debevoise.com)
Jeremy N. Klatell (jklatell@debevoise.com)
Sok T. Tea (stea@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-1031
Fax: (212) 909-6836

*Attorneys for Plaintiff Q-Med AB*

**12 CIV 8071**

RECEIVED NOV 07 2012 U.S.D.C. S.D.N.Y. CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Q-MED AB,

   Plaintiff,

   vs.

HA NORTH AMERICAN SALES AB,
MEDICIS AESTHETICS HOLDINGS INC., and
MEDICIS PHARMACEUTICAL CORP.,

   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. _____ ( )

**COMPLAINT**

Plaintiff Q-Med AB ("Q-Med"), by its attorneys Debevoise & Plimpton LLP, for its complaint against Defendants HA North American Sales AB, Medicis Aesthetics Holdings Inc. and Medicis Pharmaceutical Corp. (together, "Medicis"), alleges upon knowledge with respect to Q-Med and its own acts, and upon information and belief with respect to other matters, as follows:

**Nature of the Action**

1. This is an action in aid of arbitration to prevent Medicis from improperly transferring to Q-Med's direct competitor the exclusive rights to market and sell some of Q-Med's most important products.

2.   Pursuant to Intellectual Property License Agreements and Supply Agreements, Q-Med granted to Medicis the exclusive right to market and sell in North America certain of Q-Med's dermal filler products, including Restylane, Perlane and Sub-Q.

3.   On September 2, 2012, Valeant Phamaceuticals International, Inc. ("Valeant"), a direct competitor of Q-Med, entered into an agreement to acquire Medicis. As a result, the exclusive rights to market and sell Restylane, Perlane and Sub-Q in North America will fall into the hands of Valeant, Q-Med's direct competitor, unless such a transfer is enjoined.

4.   The Agreements between Q-Med and Medicis provide that a change of control resulting in transfer of Medicis' rights and obligations is subject to Q-Med's prior written consent. The Agreements further provide that Q-Med may withhold its consent if it "reasonably determines" that any one of five conditions exist. Four of the five conditions are present here, each of which independently triggers Q-Med's contractual right to withhold consent.

5.   Q-Med has informed Medicis that it will not consent to a change of control of Medicis that would result in a transfer to Valeant of the exclusive rights to market and sell Q-Med's dermal filler products in North America. Medicis has disputed that any of the conditions upon which Q-Med may withhold its consent are present (albeit without even attempting to substantiate that position).

6.   Medicis proposes to rush ahead with the transaction over Q-Med's objection. Q-Med has therefore commenced arbitration procedures under the mandatory arbitration provisions of the Agreements, seeking, among other relief, declaratory judgment that Medicis may not, without Q-Med's consent, consummate a change of control that would result in a transfer to Valeant of the exclusive rights to market and sell Q-Med's dermal filler products in North America.


7. Although Q-Med is confident that it will succeed on the merits of the arbitration, its ultimate victory will be a hollow formality if, during the pendency of the arbitration, exclusive rights to market and sell its products are delivered into the hands of Valeant – a company which is not only unstable, but also markets and sells its own directly competitive products.

8. Q-Med therefore brings this action in aid of its arbitration. Q-Med respectfully requests that this Court enter a preliminary injunction order preserving the *status quo* and preventing a change of control that would result in a transfer to Valeant of the exclusive rights to market and sell Q-Med's dermal filler products in North America during the pendency of the parties' arbitration. Following entry of a preliminary injunction, Q-Med expects to request that further proceedings in this Court be stayed while the arbitration proceeds, but that the Court retain jurisdiction to enter any further order that may be necessary or appropriate in aid of the arbitration or to enforce any arbitral award.

## Parties

9. Q-Med is a foreign company, formed and organized under the laws of the Kingdom of Sweden, with its principal place of business in Uppsala, Sweden. Q-Med is a biotechnology/medical device company that develops, manufactures and sells medical products.

10. Defendant HA North American Sales AB ("HANA") is a foreign company, formed and organized under the laws of the Kingdom of Sweden, with its principal place of business in Arizona. HANA is a wholly owned subsidiary of Medicis Pharmaceutical Corp. ("Medicis PC").

11. Defendant Medicis Aesthetics Holdings, Inc. ("Medicis AH") is a corporation organized under the laws of Delaware, with its principal place of business in Arizona. Medicis AH is a wholly owned subsidiary of Medicis PC.

12. Defendant Medicis PC is a corporation organized under the laws of Delaware, with its principal place of business in Arizona. Medicis PC is a specialty pharmaceutical company in the United States, focusing primarily on the treatment of dermatological and aesthetics conditions.

### Jurisdiction and Venue

13. This Court has subject matter jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 203, because the action is brought in aid of arbitration and falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, to which both the United States and Sweden are signatories.

14. This Court has personal jurisdiction over HANA, Medicis AH and Medicis PC by virtue of their transaction of business and derivation of substantial revenue from services or things used or consumed in this judicial district, their substantial and continuous contacts with this judicial district, and their purposeful availment of the rights and benefits of New York law. They engage in the sale and distribution of pharmaceutical products within the United States generally and the state of New York specifically.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c) and 9 U.S.C. § 204.

### Factual Background

The Dermal Filler Market

16. A dermal filler is an aesthetic dermatological product injected underneath the skin of the facial area below the eyes in order to smooth away wrinkles and restore volume to the face.

4

17. Dermal fillers come in three types of injectable compounds: (i) gel compositions formed from hyaluronic acid; (ii) collagen products; and (iii) gel compositions made from an alternative technology intended to mimic the effects of hyaluronic acid or collagen.

18. Q-Med manufactures and, directly and through licensees, markets and sells around the world three dermal filler products that are gel compositions derived from hyaluronic acid: Restylane, Perlane and Sub-Q. Restylane is Q-Med's flagship dermal filler product. Perlane is similar to Restylane and, in most of the world, but not in the U.S., is marketed and sold under the Restylane name. Sub-Q is a relatively new dermal filler product sold outside the U.S., and, together with Perlane, is considered by Q-Med and Medicis to be part of the "Restylane family."

19. There are several competitors in the dermal filler market. The market leading products are Q-Med's Restylane family of products, which account for about 35% of the U.S. market, and a product called Juvederm, made by Allergan, which also accounts for about 35% of the market. Other competitive products in the dermal filler market include Valeant's Sculptra product, which has a market share of just under 10%, and its Succeev and Elevess products. Medicis does not market or sell any dermal filler products that compete with the Restylane family of products.

Q-Med's and Medicis' Contractual Relationship

20. Pursuant to an Intellectual Property License Agreement dated as of July 15, 2004, by and between Q-Med and Medicis AH (the "2004 License Agreement"), Medicis was granted the exclusive right to market and sell in the United States and Canada Q-Med's dermal filler products that are gel compositions derived from hyaluronic acid, including Restylane, Perlane and Sub-Q. In conjunction with the License Agreement, Q-Med and Medicis AH entered into a

5

Supply Agreement, also dated as of July 15, 2004 (the "2004 Supply Agreement"), pursuant to which Q-Med sells, and Medicis buys for sale in the United States and Canada, the dermal filler products covered by the 2004 License Agreement.

21. Q-Med and Medicis entities also entered into a license agreement and corresponding supply agreement in March 2003. The March 2003 license and supply agreements cover a sub-set of the products which are also covered by the July 2004 agreements. Specifically, Q-Med and HANA entered into an Amended and Restated Intellectual Property License Agreement, dated as of March 6, 2003 (the "2003 License Agreement"), and Q-Med and Medicis PC entered into a Supply Agreement, dated as of March 7, 2003 (the "2003 Supply Agreement").

22. The 2004 License Agreement, 2004 Supply Agreement, 2003 License Agreement and 2003 Supply Agreement are referred to collectively herein as the "Agreements." All four Agreements contain substantially identical provisions with respect to change of control issues, dispute resolution procedures and Q-Med's consent rights, among other things.

23. Pursuant to Section 12.1 of the 2004 License Agreement (and analogous provisions of the other Agreements), Medicis may transfer its rights to a third party through a change in control of the corporate structure of Medicis subject to the prior written consent of Q-Med. Q-Med may withhold its consent to such a transfer if it "reasonably determines" that the proposed transferee meets certain criteria, including the following four:

> (i) It "is engaged in a business involving a technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources";
>
> (ii) It "is engaged in a business involving an alternate technology that is directly competitive with the technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources";

6

(iii) It "is engaged in a business directly competitive with any New Products"; or

(iv) It "does not have [a] financial condition at least comparable to that of [Medicis]" as of July 15, 2004.

24. Pursuant to Section 11.2 of the 2004 License Agreement (and analogous provisions of the other Agreements), "any dispute arising out of or in connection with this Agreement" is subject to binding arbitration. Section 11.2 of the 2004 License Agreement (and analogous provisions of the other Agreements) further provides that Q-Med "may seek an immediate injunction from a court of competent jurisdiction" to prevent the disclosure of its confidential information to a third-party or to prevent Medicis from transferring its rights in violation of the Agreements.

The Proposed Valeant Acquisition of Medicis

25. On September 2, 2012, Valeant entered into a merger agreement with Medicis pursuant to which Valeant agreed to purchase all outstanding common stock of Medicis, subject to satisfaction of certain conditions, including, among others, obtaining regulatory approvals and approval of the Medicis shareholders.

26. Pursuant to the merger, Medicis' exclusive rights to market and sell Q-Med's products in the U.S. and Canada would transfer to Valeant.

27. A vote by Medicis' shareholders to approve the merger is currently scheduled for December 7, 2012.

Valeant's Competitive Products

28. Valeant owns three dermal filler products that compete directly with the Restylane family of products: Elevess, Succeev and Sculptra.

29. Both Elevess and Succeev are dermal filler products "involving a technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources."

30. Sculptra is a dermal filler product "involving an alternate technology that is directly competitive with the technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources."

31. Medicis' Form 10-K filing for 2011 lists Sculptra and Elevess, along with other dermal filler products, under the heading "Competition," and describes the differentiating features which could cause some consumers to choose Sculptra or Elevess over Restylane products. Similarly, in the "Risk Factors" section, the 10-K describes "intense competition" in the dermal filler market from Sculptra, Elevess and other products as a material business risk.

32. Medicis' 2013 "Brand Plan" for the Restylane family of products, which Medicis provided to Q-Med, describes Scupltra as being in the same market as, and competing for market share with, the Restylane family.

33. In the 2013 "Brand Plan" for the Restylane family of products, Medicis acknowledges that "HAs [hyaluronic acid-based dermal fillers] are perceived as interchangeable." The Restylane family of products, Elevess and Succeev, are all hyaluronic acid-based dermal fillers.

34. For the same reasons as stated above, Sculptra, Elevess and Succeev are each "directly competitive with any New Products," namely Sub-Q.

35. The 2003 Supply Agreement expressly stated that Sub-Q falls within the definition of "New Product." Medicis has accepted an Offer Notice concerning Sub-Q, and

8

Medicis and Q-Med jointly funded clinical trials for Sub-Q to develop potential uses for the product.

Valeant's Financial Condition Is Not Comparable to Medicis' Financial Condition

36. Valeant's financial condition is dramatically more precarious than that of Medicis in 2004.

37. In July 2004, at the time of the 2004 License Agreement and 2004 Supply Agreement, when Q-Med chose to contract with Medicis as its exclusive licensee in the United States and Canada, Medicis was, financially, a conservative, profitable and ultra-stable business partner.

38. Medicis' 2004 net financial debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") ratio was negative 1.48:1, meaning that Medicis had cash and cash equivalents exceeding the small amount of its debt outstanding. Its financial debt to equity ratio was 0.26:1 in 2004.

39. Medicis reported net income ranging from $30.8 million to $51.3 million for each of the five fiscal years ending June 30, 2000 through June 30, 2004.

40. By contrast to Medicis, Valeant is at the opposite end of the spectrum of volatility, credit risk and attendant business risk. It has followed an aggressive, debt-fueled acquisition strategy resulting in dangerously high levels of debt and leverage.

41. Valeant has acquired more than a dozen companies in the last two years alone.

42. When Valeant announced the deal to acquire Medicis, it disclosed disconcertingly high amounts of leverage. Specifically, Valeant reported a 4.6:1 net financial debt to EBITDA ratio when it announced the acquisition of Medicis.

43. This level of leverage is not only vastly higher than Medicis' negative leverage in 2004, it is also significantly higher than the industry average.

44. Valeant's estimated financial debt to equity ratio will be about 0.59:1 following the Medicis acquisition, including the estimated $2.75 billion bridge loan.

45. Moody's Investors Service, Inc. ("Moody's") maintains a negative corporate rating of Ba3 for Valeant. Companies rated Ba by Moody's are judged to have "speculative elements and are subject to substantial credit risk," with the modifier 3 indicating a ranking in the lower end of the Ba category.

46. Moody's explains that its "negative rating outlook" for Valeant reflects the credit risks associated with Valeant's aggressive acquisition strategy and high leverage. Moody's further anticipates that it "could downgrade the ratings if Valeant increases its leverage substantially above 4.0 times or if Valeant faces unforeseen integration challenges or legal issues."

47. Standard & Poor's Ratings Services ("S&P") similarly maintains a BB corporate rating for Valeant. S&P characterizes a company with a BB rating as one that "faces major ongoing uncertainties to adverse business, financial and economic conditions."

48. S&P explains that its negative rating of Valeant "reflects our belief that Valeant remains committed to a 'significant' financial risk profile." S&P further anticipates that "[a]lthough we could revise our assessment of business risk to 'satisfactory' on the successful integration of Medicis, in the absence of the adoption of a more conservative financial policy where leverage is sustained below 3x, an upgrade is unlikely."

10

49.     In addition to dangerously high levels of debt, Valeant has also experienced volatility in profitability. Valeant reported a net loss of $208.2 million in 2010, net income of $160 million for 2011, and net loss of $34.5 million for the six months ended June 30, 2012.

Q-Med's Right To Withhold Consent

50.     Q-Med has the right to withhold consent to a change of control of Medicis that would result in a transfer to Valeant of the exclusive rights to market and sell Q-Med's dermal filler products in North America.

51.     The proposed acquisition of Medicis by Valeant would constitute a "Volitional Change in Control," as defined at Section 1.1 of the 2004 License Agreement (and analogous provisions of the other Agreements).

52.     As a "Volitional Change in Control," the proposed acquisition is subject to Q-Med's "prior written consent" under Section 12.1(c) of the 2004 License Agreement (and analogous provisions of the other Agreements). Q-Med may withhold its consent if Q-Med "reasonably determines" that any of five conditions specified at Section 12.1(c) of the 2004 License Agreement (and analogous provisions of the other Agreements) are present.

53.     Q-Med has reasonably determined that four of the five conditions are present with respect to the proposed acquisition of Medicis by Valeant.

    a.     Valeant "is engaged in a business involving a technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources." Specifically, Valeant has two products – Elevess and Succeev – which, just like the Restylane family, "involv[e] a technology utilizing biocompatible gel compositions formed from

polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources."

b.  Valeant "is engaged in a business involving an alternate technology that is directly competitive with the technology utilizing biocompatible gel compositions formed from polymerized and cross-linked hyaluronic acid wherein the hyaluronic acid is derived from non-animal sources." Specifically, Valeant markets and sells Sculptra, a dermal filler product which uses an alternate technology to Q-Med's Restylane family, but which is directly competitive with them.

c.  Valeant "is engaged in a business directly competitive with any New Products." Specifically, Valeant has three products, Scupltra, Elevess and Succeev, which all compete directly with Sub-Q (which the parties have confirmed in writing is a "New Product" for these purposes).

d.  Valeant "does not have [a] financial condition at least comparable to that of [Medicis]" as of July 15, 2004. Valeant's financial condition is dramatically more precarious than that of Medicis in 2004.

<u>The Parties' Dispute</u>

54.  Following announcement of Valeant's proposed acquisition of Medicis, on September 25, 2012, Q-Med's CEO wrote a letter to Medicis' CEO concerning Q-Med's consent rights under the 2004 License Agreement, specifically as such rights relate to the acquisition.

55.  The letter noted that the proposed acquisition would constitute a "Change in Control" under the 2004 License Agreement and, as such, would be subject to Q-Med's written consent.

56. The letter further noted that, under the 2004 License Agreement, Q-Med may withhold its consent if certain conditions are present, and the letter went on to explain that four of those conditions were in fact present with respect to the proposed acquisition of Medicis by Valeant. The letter notified Medicis that Q-Med does not consent to a change of control resulting in a transfer of Medicis' rights to Valeant.

57. On September 28, 2012, the CEO of Medicis wrote a response to the CEO of Q-Med. Medicis' response acknowledged that Q-Med's consent is required, but indicated that Medicis disagreed (without providing any basis for its position) that conditions triggering Q-Med's right to withhold consent were present.

58. Valeant has stated publicly that it does not feel there are any change of control provisions related to products that Medicis markets or sells that may impede Valeant's acquisition of Medicis.

59. In light of the parties' disagreement, Q-Med commenced arbitration proceedings in accordance with the dispute resolution procedures prescribed in the Agreements.

60. The Agreements provide that all disputes thereunder are to be resolved by mandatory arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC").

61. Before a demand for arbitration may be filed, however, the Agreements require that the aggrieved party serve the other party with a Notice of Claim describing the dispute, that the other party respond in writing, and that the parties file a demand for arbitration only if they have been unable to resolve their dispute within twenty days thereafter.

62. Q-Med served its Notice of Claim in accordance with these procedures on October 12, 2012.

63. On October 26, 2012, Medicis responded to Q-Med's Notice of Claim. Medicis disputed that Q-Med has grounds to withhold its consent, yet again failed to provide any support for that position.

64. Medicis' response makes clear that the parties will be unable to resolve their dispute, and Q-Med therefore intends to file a demand for arbitration with the ICC on or shortly after November 15, 2012.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

65. Q-Med repeats and realleges each and every allegation set forth in Paragraphs 1 through 64 of the Complaint as if fully set forth herein.

66. Pursuant to 28 U.S.C. § 2201(a), Q-Med seeks a declaration of this Court that Q-Med has the right to withhold consent in accordance with the terms of the Agreements.

67. Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought. Medicis has taken the unequivocal position that none of the conditions upon which Q-Med may withhold its consent are present and proposes to rush ahead with the transaction over Q-Med's objections.

68. Declaratory relief would serve the useful purpose of clarifying the parties' rights under the Agreements.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

69. Q-Med repeats and realleges each and every allegation set forth in Paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70. The Agreements are valid and binding written contracts, made for valid consideration, and governed by New York law.

71. Q-Med has performed its obligations under the Agreements.

72.  Q-Med has informed Medicis that it will not consent to a change of control of Medicis that would result in a transfer to Valeant of the exclusive rights to market and sell Q-Med's dermal filler products in the U.S. and Canada.

73.  Medicis has disputed that any of the conditions upon which Q-Med may withhold its consent are present and proposes to rush ahead with the transaction over Q-Med's objection. By doing so, Medicis has willfully, materially, unjustifiably and inexcusably breached or anticipatorily breached the Agreements.

74.  Absent an injunction, Q-Med will suffer severe, irreparable harm as a result of Medicis' conduct.

## **Prayer for Relief**

WHEREFORE, Q-Med respectfully request that this Court enter a Judgment, in favor of Q-Med and against Medicis, providing as follows:

A. Declaring that Q-Med has the right to withhold consent in accordance with the terms of the Agreements;

B. Medicis has materially breached its obligations under the Agreements, entitling Q-Med to contract remedies, including, without limitation, termination or rescission of the Agreements;

C. Preliminarily enjoining Medicis from transferring its rights under the Agreements to Valeant to preserve the *status quo* during the pendency of the arbitration proceedings between the parties; and

D. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 7, 2012

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: _____
Jyotin Hamid (jhamid@debevoise.com)
Jeremy N. Klatell (jklatell@debevoise.com)
Sok T. Tea (sttea@debevoise.com)
919 Third Avenue
New York, New York 10022
(212) 909-1031

*Attorneys for Plaintiff Q-Med AB*

16