UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Q-MED AB,

                Plaintiff,

- against -

HA NORTH AMERICAN SALES AB,
MEDICIS AESTHETICS HOLDINGS INC., and
MEDICIS PHARMACEUTICAL CORP.,

                Defendants.

12 Civ. 8071 (RJS)

**DECLARATION OF HOWARD B. SCHILLER IN SUPPORT OF DEFENDANTS' OPPOSITION TO Q-MED AB'S MOTION FOR PRELIMINARY INJUNCTION**

      HOWARD B. SCHILLER, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am the Executive Vice President and Chief Financial Officer and a member of the Board of Directors of Valeant Pharmaceuticals International, Inc. ("Valeant"). I joined Valeant in December 2011 after 24 years at Goldman Sachs. My last position at Goldman Sachs was Chief Operating Officer for the Investment Banking Division.

      2.     Valeant is a specialty pharmaceutical company headquartered in Montreal that is listed on both the New York Stock Exchange and the Toronto Stock Exchange. Valeant has operations in approximately 40 countries and approximately 7,000 employees worldwide. I submit this declaration in support of Defendants' Opposition to Q-Med AB's Motion for Preliminary Injunction.

      3.     I was involved in negotiating and have personal knowledge of Valeant's pending acquisition of Medicis Pharmaceutical Corporation ("Medicis"). I am

competent to testify about the subject matters addressed in this declaration, which is based on my own personal knowledge or my discussion with employees and consultation of business records of the company.

4. I understand that Q-Med AB ("Q-Med") is seeking to interfere with Valeant's proposed acquisition of Medicis based on, among other things, (i) Q-Med's assertion that three products which purportedly are part of Valeant's broad product portfolio are directly competitive with products marketed by Medicis, and (ii) Q-Med's assertions concerning the financial condition of Valeant relative to the financial condition of Medicis in 2003 and 2004 at the time the relevant contracts were executed. I will address Valeant's financial condition relative to that of Medicis (and the Medicis subsidiaries that are parties to the relevant contracts with Q-Med) and certain aspects of Valeant's product portfolio.

5. As discussed above, I understand that Q-Med is asserting that Valeant's financial condition is not comparable to that of Medicis back in 2004. At the outset, it is important to bear in mind that Medicis is not in all cases the other party to the relevant contracts with Q-Med; in two out of four instances, that other party is, or was at the time the agreement was entered into, a subsidiary of Medicis. In most cases, subsidiaries have fewer assets and lower cash flow than their parent company. As a result, the relevant comparison of financial condition set forth below favors Valeant even more.

6. Q-Med also ignores that, under the proposed transaction structure, which is a so-called reverse triangular merger, Medicis will continue in existence as an indirect, wholly-owned subsidiary of Valeant. The Medicis subsidiaries likewise will

remain wholly-owned subsidiaries of Medicis. Each of the Medicis entities will remain a party to, and obligated to perform under, the agreements between Medicis and Q-Med. Valeant intends to continue operating Medicis as a standalone entity and has no current plans to remove assets or lines of business from Medicis. As a result, each of the Medicis entities will continue to have a financial condition that is at least comparable to its financial condition as of the relevant date (*i.e.*, 2003 or 2004). The addition of Valeant as a parent corporation with a far larger balance sheet and more extensive operations than Medicis can only serve to enhance the financial condition of the Medicis entities that are parties to the various agreements with Q-Med.

7. In any event, in leveling the accusation that Valeant's financial condition is not "stable," Q-Med appears to be relying exclusively on the level of Valeant's debt and its current credit ratings. The assertions that Valeant has "dangerously high levels of debt" and that its finances are "precarious" are simply false. Valeant is a large and diversified company that is much larger than Medicis and has much higher net income and operating cash flow. Valeant has ample financial capacity and operating cash flow to ensure that the Medicis entities continue to comply with their obligations under contracts with Q-Med.

8. As of yesterday, Valeant's market capitalization was $16.66 billion and its total enterprise value was $24.14 billion. By contrast, as of June 30, 2004, Medicis had a market capitalization of only $2.3 billion and a total enterprise value of only $2.1 billion. Plainly, Valeant is many times the size that Medicis was in 2004. In addition, for the year ended December 31, 2011, Valeant's net income was $160 million, compared to Medicis' net income of $30.8 million in its fiscal year ended June 30, 2004.

Lastly, Valeant's cash flow from operations in 2011 was $676 million, compared to Medicis' cash from operations of $128 million in fiscal year 2004. There can be no doubt that Valeant has ample cash to enable the Medicis entities to continue meeting all of their contractual obligations to Q-Med.

9. To put the matter in perspective, the payments that the Medicis entities must make to Q-Med under the license agreement are expected to be approximately $20 million in 2012. Valeant currently has cash on hand of more than $600 million and an undrawn balance on a revolving credit facility of $450 million. In other words, Valeant currently has access to more than $1 billion in cash to finance its operations.

10. Leading financial institutions do not share Q-Med's view that Valeant is not creditworthy. Valeant received a fully underwritten commitment for $2.75 billion from JPMorgan to fund the purchase of Medicis. In the end, Valeant decided to seek alternate financing for the transaction, and was able to raise $2.75 billion through a $1 billion term loan and $1.75 billion high-yield debt offering in just two days.

11. Moreover, as Valeant's Chief Executive Officer J. Michael Pearson explained on a conference call discussing the merger, the annual cost savings resulting from Valeant's acquisition of Medicis will likely "significantly exceed" Valeant's initial $225 million forecast. Valeant anticipates that the transaction will be immediately accretive to its earnings, thereby improving Valeant's financial condition.

12. In terms of stability, Valeant's product portfolio is significantly more diverse as compared to Medicis' product portfolio. Valeant has a product portfolio comprised of more than 900 products in a wide variety of areas, from dermatology to

neurology to podiatry. No single product accounts for more than ten percent of Valeant's annual revenue. Medicis' portfolio, on the other hand, was comprised of 15 branded products in 2004 and currently is comprised of 26 branded products, primarily focused on dermatology and aesthetics. Medicis' largest product, Solodyn, represented more than 50% of the company's reported net sales in 2011. In addition, the Valeant product portfolio is sold by a large and very capable sales force that is many times the size of the Medicis sales force in 2004 (or now). In short, the breadth of Valeant's product portfolio and the company's geographic reach make Valeant more stable than Medicis was in 2004, not less.

13.     I understand that Q Med asserts that three products which purportedly are part of Valeant's broad product portfolio are directly competitive with products marketed by Medicis. I will address two of those products, Elevess and Suceev.

14.     Contrary to what Q-Med contends, Valeant does not own the product called Elevess and does not distribute that product anywhere in the world.

15.     Valeant obtained certain intellectual property and distribution rights for the product called Suceev in its acquisition of Dermik from Sanofi last year. Pursuant to a transitional sales agreement with Valeant, Sanofi is continuing to distribute Succeev on a worldwide basis. Suceev is a minor product that is currently sold in only seven countries, not including the United States. Those countries are: France, Germany, Ireland, Malaysia, Singapore, Spain, and the United Kingdom. In 2010, Sanofi's worldwide sales of Succeev totaled approximately $1.5 million. In 2011, Sanofi's worldwide sales of Succeev totaled approximately $2.5 million. Sanofi's worldwide sales of Succeev are projected to total approximately $2.5 million this year.

16. On September 28, 2012, Valeant entered into an agreement with Sinclair Pharmaceuticals Limited ("Sinclair") pursuant to which Sinclair will distribute Succeev in Western European countries (the "Distribution Agreement"). Under the Distribution Agreement, Sinclair will have primary control and direction over the distribution of Succeev in its territories. In particular; (i) Sinclair will have sole authority to determine the prices charged for Succeev; (ii) Sinclair will have sole responsibility for shipping, distributing, warehousing, and invoicing for sales of Succeev; (iii) Sinclair will have the obligation to seek pricing and reimbursement approvals from relevant governmental entities; and (iv) Sinclair will have the obligation to comply with applicable laws and prevailing standards of conduct. Under the Distribution Agreement, Sinclair will provide Valeant with an annual marketing plan, to be reviewed by a joint committee of Valeant and Sinclair representatives; however, Sinclair has the right to make all final decisions regarding distribution strategies, distribution budgets and staffing plans.

17. I also understand that Q-Med asserts that, as a result of this transaction, Valeant will cause Medicis to neglect the products that are subject to the license agreements between Medicis and Q-Med. This is flatly untrue. As Mr. Pearson has publicly stated:

> The acquisition of Medicis represents a significant next step in our journey to become the leader in dermatology by strengthening Valeant's presence in acne, actinic keratosis, aesthetic injectables and anti-virals, among others. Medicis' highly complementary portfolio of leading branded products and promising pipeline is a solid strategic fit, and we look forward to leveraging Medicis' well known and respected name in dermatology to drive long-term growth.

It would be economically irrational for Valeant to acquire Medicis and then impair the value of important Medicis products. That is especially true when the sales of those Medicis products are more than double the sales of Valeant products that I understand Q-Med claims are directly competitive with its products. Sales of Restylane and Perlane in 2011 in the United States and Canada (the only countries where Medicis has the right to distribute those products) were approximately $113.5 million. Worldwide sales of Sculptra, a Valeant product that Q-Med claims is directly competitive with Restylane and Perlane, were approximately $57 million. If anything, Q-Med stands to benefit from the addition of the Medicis products to the complementary products in Valeant's product portfolio.

  Executed this 14th day of November, 2012 in Scottsdale, Arizona.

  I declare under penalty of perjury that the foregoing is true and correct.

_____<br>Howard B. Schiller