UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Q-MED AB,<br><br>                              Plaintiff,<br><br> - against -<br><br>HA NORTH AMERICAN SALES AB,<br>MEDICIS AESTHETICS HOLDINGS INC., and<br>MEDICIS PHARMACEUTICAL CORP.,<br><br>                              Defendants. | 12 Civ. 8071 (RJS)<br><br>DECLARATION OF JONAH SHACKNAI IN SUPPORT OF DEFENDANTS' OPPOSITION TO Q-MED AB'S MOTION FOR PRELIMINARY INJUNCTION |

JONAH SHACKNAI, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am Chief Executive Officer and Chairman of the Board of Directors of Medicis Pharmaceutical Corporation ("Medicis"). I have served in that capacity since founding the company in 1988. Previously, I was an executive at another pharmaceutical company, a law firm partner and chief aide of the committee in the House of Representatives with responsibility for health policy.

2.      I make this declaration in opposition to the Motion for Preliminary Injunction filed by Q-Med AB ("Q-Med"). I set forth below certain information concerning Medicis, its relationship with Q-Med, the pending merger transaction between Medicis and Valeant Pharmaceuticals International ("Valeant"), and the harm that will be suffered by Medicis and its shareholders in the event that merger is enjoined. I also recount certain conversations that I have had with Humberto C. Antunes, the Chief Executive Officer of both Q-Med and its parent, Galderma SA ("Galderma"), that demonstrate to me that Q-Med filed this action in an effort to

gain leverage in its longstanding effort to acquire the aesthetics business of Medicis rather than any perceived contract right.

**About Medicis.**

3. Medicis is a leading independent specialty pharmaceutical company with its principal place of business in Scottsdale, Arizona. Its product lines focus on the treatment of dermatological and aesthetic conditions. The company is traded on the New York Stock Exchange.

4. For the year ended December 31, 2011, Medicis had net revenues of $721 million. Medicis had net revenues of $578 million over the first nine months of 2012. Of the 2012 revenues, 15.7% owed to Medicis's aesthetics portfolio. The Restylane products at issue in this case, in turn, accounted for 66.3% of Medicis's aesthetics portfolio during that period, or 10.4% of Medicis's total revenue, year to date. Put another way, Medicis has revenues of more than $600 million per year from products that have nothing to do with the Q-Med dermal fillers that are involved in this litigation.

**Medicis Licenses the Restylane Family of Products from Q-Med.**

5. Medicis's principal aesthetic products are the Restylane family of products, which include Restylane and Perlane. These are hyaluronic acid ("HA") dermal fillers used, for example, to treat facial wrinkles.

6. Q-Med, on the one hand, and Medicis and affiliates, on the other, have entered into four agreements that are relevant here: an IP licensing agreement and a supply agreement, entered into in 2003 relating to the marketing and distribution of Restylane and Perlane; as well as an IP licensing agreement (IPLA) and a supply agreement entered into in 2004, relating to another dermal filler product, Sub-Q. ( Exhibits A-D to the Declaration of

2

Jyotin Hamid, dated November 7, 2012, submitted in connection with Q-Med's Motion for a Preliminary Injunction.) By operation of these agreements, Medicis acquired the exclusive right to market and distribute these dermal filler products in North America, and Q-Med, which manufactures the products, agreed to supply them to Medicis. Q-Med remains the exclusive distributor of these products everywhere else in the world. The 2003 IPLA caps direct damages at $160 million

7. Medicis has paid almost $200 million in license payments to Q-Med under the 2003 and 2004 Agreements. These were largely "front-loaded" payments tied to the FDA approval of the products required before Medicis could market them in the United States. Under the agreements, Medicis is obligated to, and did, obtain regulatory approvals for the licensed products and continues to expend significant resources on regulatory matters. Medicis owns the trademarks for the Restylane family of products. In bringing them to market, Medicis hired a sales force, made substantial other investments in the Q-Med products as well, and effectively has been responsible for the launch, development, growth and current leading position of the Restylane business in the United States and Canada.[1]

8. Medicis also makes ongoing payments pursuant to the agreements, which relate to Q-Med's provision of the products that it manufactures. Currently, Medicis's payments to Q-Med total approximately $20 million per year. At this point, the relationship can fairly be characterized as one in which Medicis simply pays Q-Med to deliver a certain number of devices annually, and Q-Med does so.

---

[1] This Declaration is submitted to address whether certain products are competitive are the marketplace. As such, I set forth my understanding concerning how the products are actually used by practitioners. While Medicis does not market to, or encourage, off-label marketing in any way, and in fact has strict compliance policies against it, I provide this evidence to assist the Court in applying the relevant contractual provisions.

**Medicis's Merger with Valeant.**

9. The background of the proposed merger is summarized in the Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, mailed to Medicis's shareholders on November 5, 2012 (the "Proxy") (relevant excerpts of which are attached as Exhibit A hereto). As set forth in the Proxy, on September 2, 2012, Valeant, Valeant Pharmaceuticals International ("VPI"), a wholly owned subsidiary of Valeant, Merlin Merger Sub, Inc. ("Merger Sub"), a wholly owned subsidiary of VPI, and Medicis entered into an Agreement and Plan of Merger (the "Merger Agreement," relevant excerpts of which are attached as Exhibit B hereto). The Merger Agreement provides that Merger Sub will merge with and into Medicis, with Medicis surviving as a wholly owned subsidiary of VPI. (Ex. B, § 1.1.) As a result of the merger, the corporate existence of Merger Sub will cease and Medicis will continue as the surviving corporation. (*Id.*) As a result, each of the now-existing Medicis entities that is a party to the 2003 and 2004 Agreements will continue to exist post-merger.

10. Valeant will acquire all of the outstanding common stock of Medicis for $44.00 per share in cash, a price that represents a substantial premium over the trading price of Medicis prior to the announcement of the deal, of more than $730 million. The transaction, which values Medicis's common stock at approximately $2.6 billion, has been approved unanimously by the boards of directors of both companies. The shareholders of Medicis will vote on the transaction on December 7, 2012.

**<u>Medicis and Its Shareholders Would Be Severely Harmed by An Injunction.</u>**

11. I understand that, by this application for a preliminary injunction, Q-Med seeks to delay or prevent the merger from occurring. This would cause substantial harm to Medicis and its shareholders.

12. The time period between the announcement and closing of any merger transaction, including this one, is an uncertain one that poses operational challenges for the company to be acquired for many reasons. First, the Valeant merger agreement contains customary restrictions on Medicis's freedom to operate its business during the pre-closing period. These restrictions create risk that Medicis will not be able to respond to changing market conditions so as to preserve the value of Medicis's business, a risk that is exacerbated in the case of a delayed closing. Second, additional Medicis employees, concerned about their future employment prospects at the merged company and the uncertainty of the transaction, are likely to depart for other jobs if the closing date is extended. Similarly, maintaining relationships with key customers and suppliers through closing will be more difficult for Medicis if the transaction is delayed. Medicis is thus more vulnerable to its competitors.

13. Additionally, the merger is a significant financial benefit for Medicis shareholders. It will provide immediate liquidity and certainty of value to those shareholders, since it is a pure cash transaction, which would be lost if the merger is enjoined. Valeant's $44.00 purchase price represents a 39.4% premium compared to the closing price of Medicis common stock on August 31, 2012 (the last full trading day prior to the announcement of the Merger); a 33.7% premium compared to the 30-day average price of Medicis common stock as of August 31, 2012; and an 11.8% premium compared to the highest closing price of Medicis common stock over the last year. If the Merger does not occur, that premium to Medicis shareholders may well be lost. Even a delay in the transaction into 2013 may well be costly to

Medicis shareholders given the belief in the marketplace that capital gains taxes will be increased next year. Any delay in closing the Merger creates the opportunity for unexpected events to arise that could allow Valeant to terminate the Merger or attempt to renegotiate the substantial premium currently offered to Medicis shareholders.

**Galderma's Overtures to Acquire Medicis's Aesthetics Division.**

14. Galderma, a Swiss pharmaceutical company created in 1981 as a joint venture of Nestle and L'Oreal, is a specialty pharmaceutical company dedicated exclusively to dermatology. Galderma and Medicis have vied tooth and nail for years to be the leading dermatology company in North America.

15. In 2011, Galderma acquired Q-Med, a transaction to which Medicis gave its consent under the 2003 and 2004 Agreements. Prior to its acquisition by Galderma, Q-Med and Medicis enjoyed a close, collaborative relationship; indeed, before Galderma purchased it, Q-Med repeatedly urged over the years, without success, to merge with Medicis. After the acquisition, the relationship deteriorated. It was apparent that Galderma, which has long coveted entry into the North American dermal filler market, viewed the Medicis license arrangements as an obstacle to its enjoying world-wide distribution rights of the Restylane products.

16. Over the past several years, I have come to know Mr. Antunes through participation in industry associations, conferences, and similar types of events. In those conversations, Mr. Antunes has expressed repeatedly Galderma's strong desire to acquire Medicis's aesthetics division, including the Restylane family of products.

17. The first such approach occurred several years ago. I advised Mr. Antunes that although the company was not for sale, I was obligated to act in the best interests of the shareholders, and would transmit any offer to the Medicis Board of Directors. We spoke a

number of times, and exchanged exclusively public information. The negotiations never progressed, because it appeared that Galderma had lost interest.

18. In 2010, Mr. Antunes again approached me about whether Medicis would be interested in selling its aesthetics division to Galderma. Mr. Antunes explained that, in his view, Galderma was not a "complete company" without a presence in the aesthetics space—that it was an "acutely absent" part of its business. He further explained that he thought it was important for Galderma to have exposure to the aesthetics industry, in which consumers typically pay cash for products, to balance their rather substantial exposure to government and insurance payors. He told me that Galderma's joint venture parents, Nestle and L'Oreal, were pressuring him to enter the aesthetics business. Although no discussions ensued, not long after, Galderma purchased Q-Med, which in fact is in the aesthetics business.

19. Since Galderma acquired Q-Med, Mr. Antunes has told me on a number of occasions that he has been pleased to have Medicis as Q-Med's partner. He has also told me that if the Medicis business ever fell into anyone else's hands, Galderma would want it. In response to these types of statements, I have consistently explained to Mr. Antunes that Medicis had paid nearly $200 million cash for licenses to distribute the Restylane family of products, made numerous other investments in obtaining regulatory approvals, and had done an excellent job in developing the North American market for Q-Med. I have told Mr. Antunes on more than one occasion that our license with Q-Med is a significant asset of Medicis that could not simply revert to Q-Med.

**Mr. Antunes Attempts to Disrupt Valeant's Acquisition of Medicis.**

20. In August 2011, the *Wall Street Journal* reported that Valeant had an interest in acquiring Medicis. When this article came out, I was in San Diego, California, at

Medicis's national sales meeting, and Mr. Antunes called me there. He told me, "[w]e [Galderma] can be your poison pill." I did not understand what he meant until he explained that Galderma really wanted Medicis's aesthetics business; that if Medicis sold it to Galderma, Medicis would have plenty of cash, which it could dividend to shareholders, which would repel Valeant; and, in all events, such a sale would change Medicis's business in a way that Valeant would not like. Mr. Antunes told me that, if Valeant pursued an offer for Medicis, Galderma would want to buy at least the aesthetics business. In response, I told Mr. Antunes that Medicis was not for sale, nor was any division, but that if he had an offer to make, the Company would be duty-bound to listen to it. Mr. Antunes responded that his Swiss owners were on vacation, and that it would take a while to organize a proper offer. I never heard back from Mr. Antunes.

21. On September 25, 2012, approximately three weeks after the announcement of the Valeant transaction as to which Medicis had expended considerable resources, I received a call from Mr. Antunes. He was very agitated, and told me that the transaction with Valeant was personally embarrassing to him. Mr. Antunes stated that it was "unacceptable" for Medicis's aesthetics division to fall into Valeant's hands, and that Galderma would make sure it would not be acquired by anyone other than them. Mr. Antunes asserted that Galderma had paid a lot of money for Q-Med, and he would lose face with the owners if he could not get Medicis's North American rights to Restylane, so as to gain worldwide exclusivity for Restylane products. He was angry that I did not call him to first offer the aesthetics business to Galderma. Mr. Antunes further represented that Galderma would be willing to buy all of Medicis to stop the deal, although what he really wanted was the aesthetics business.

22. Mr. Antunes also informed me that he had been having some conversations with Valeant about acquiring its aesthetics business, and that those talks had been

8

unsuccessful. Mr. Antunes further advised that, as part of its efforts to put pressure on Medicis, it would be sending us a letter expressing its objections to the transaction. I received that letter minutes after the call ended. During the conversation, I advised Mr. Antunes that if he was interested in acquiring our aesthetics business, he should discuss a post-closing transaction with Michael Pearson, the CEO of Valeant. Given our obligations under the Merger Agreement, I was unable to discuss such a sale. I now understand that, in fact, such discussions have been had.

23. Within hours after I learned that Q-Med had filed this injunction proceeding, on November 7, 2012, I got a call from Mr. Antunes. Mr. Antunes informed me that he had been engaged in productive initial discussions with Valeant about acquiring the Medicis aesthetics business post-closing, but that he considered Valeant's view on price "outrageous." I explained to Mr. Antunes that I had no ability to discuss these matters with him, because we were committed to the Merger Agreement, and that he should continue discussions with Mr. Pearson if he wanted to try to negotiate such an acquisition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   Scottsdale, Arizona
         November 14, 2012

_____
Jonah Shacknai