# Exhibit A

DEFM14A 1 d411935ddefm14a.htm DEFINITIVE PROXY STATEMENT

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A
**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under Rule 14a-12

# MEDICIS PHARMACEUTICAL CORPORATION
**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  (1)   Title of each class of securities to which transaction applies:

  (2)   Aggregate number of securities to which transaction applies:

  (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

  (4)   Proposed maximum aggregate value of transaction:

  (5)   Total fee paid:

Table of Contents

Valeant, a Delaware corporation, is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, neurology and branded generics. Valeant is a wholly-owned subsidiary of VPII.

***Merlin Merger Sub, Inc.***
700 Route 202/206 North
Bridgewater, New Jersey 08807
(866) 246-8245

Merger Sub, a Delaware corporation and a wholly-owned subsidiary of Valeant, was organized solely for the purpose of entering into the merger agreement with Medicis and completing the merger and has not conducted any business operations other than those incident to its formation and the transactions contemplated by the merger agreement. If the merger is completed, Merger Sub will cease to exist following its merger with and into Medicis.

**Background of the Merger**

Medicis' management and board of directors, which we refer to as the board, review Medicis' long-term strategic plan on a regular basis with the goal of maximizing stockholder value. As part of this review, the board and management of Medicis have periodically evaluated potential strategic alternatives relating to Medicis' businesses and engaged in discussions with third parties concerning potential strategic transactions, including a sale of Medicis.

In early June 2011, and without prior solicitation from Medicis or its advisors, J. Michael Pearson, Chairman and Chief Executive Officer of VPII, contacted Jonah Shacknai, Chairman and Chief Executive Officer of Medicis, regarding VPII's potential interest in an acquisition of Medicis. Mr. Pearson indicated that VPII was potentially interested in acquiring all of the outstanding shares of common stock of Medicis at a purchase price of up to $48 per share, subject to due diligence review and other conditions, and requested further meetings with Medicis management.

The board held a telephonic meeting on June 19, 2011 to discuss a potential acquisition of Medicis by VPII and consider VPII's request to meet with Medicis' management. During the June 19, 2011 meeting, representatives of Latham & Watkins LLP, or Latham & Watkins, counsel to Medicis, and Weil, Gotshal & Manges LLP, or Weil, counsel to Medicis, reviewed with the board its fiduciary duties with respect to a potential strategic transaction. Representatives of Deutsche Bank, which had served as financial advisor to Medicis on certain prior matters and had a familiarity with Medicis and its business, discussed certain preliminary financial information relating to VPII's proposal with the board. The board authorized management to continue discussions with VPII regarding the potential transaction and authorized management to make available to VPII certain limited due diligence materials regarding Medicis upon the signing of a non-disclosure agreement containing customary confidentiality, standstill and non-solicitation provisions. The board directed management to report back with any material developments with respect to VPII's proposal and stressed the importance of management continuing to execute Medicis' business plan and strategic initiatives in the normal course notwithstanding discussions with VPII. The board also authorized management to formally engage Deutsche Bank as Medicis' financial advisor in connection with the board's consideration of a potential sale of Medicis, and to negotiate the terms of engagement on reasonable terms consistent with current market practice. However, Medicis did not enter into an engagement letter with Deutsche Bank prior to the termination of its discussions with VPII in early August 2011, as described below.

Following the June 19, 2011 board meeting, members of senior management of Medicis and VPII engaged in discussions on several occasions regarding a potential transaction.

27

Table of Contents

On July 14, 2011, VPII executed a non-disclosure agreement with Medicis that included restrictions on VPII's ability to contact potential financing sources and customary standstill and non-solicitation provisions. On July 18, 2011, VPII delivered to Deutsche Bank a preliminary diligence list requesting certain specified information regarding Medicis' business and products. Representatives of Latham & Watkins, with the assistance of management of Medicis, established a virtual data room, which we refer to as the data room, that was populated with a limited amount of non-public information regarding Medicis in response to VPII's specific diligence requests, with certain information being withheld or redacted to protect sensitive business and proprietary information. Medicis granted VPII and its advisors access to the data room during the second half of July 2011 and VPII conducted preliminary due diligence of certain aspects of Medicis throughout the remainder of July and into early August 2011.

Members of senior management of Medicis and VPII continued to engage in various discussions regarding a potential acquisition of Medicis by VPII into August 2011, including presentations delivered by Medicis senior management regarding Medicis' business. Medicis and its advisors also participated in a series of internal conference calls and meetings to discuss details of a possible transaction, updated financial information relating to VPII's proposal, management forecasts, and other considerations regarding the strategic process.

An in-person meeting was scheduled for August 5, 2011, between Messrs. Pearson and Shacknai and one member of each of the companies' boards of directors. During the week preceding this meeting, the closing price of shares of common stock of both Medicis and VPII experienced a decline. The closing price per share of common stock of Medicis dropped from a price of $37.18 on July 29, 2011 to $35.35 on August 2, 2011 and $32.11 on August 4, 2011. The closing price per share of VPII's common shares on August 3, 2011 was $52.26, and following its earnings announcement on August 4, 2011, the price declined to $40.85.

On August 5, 2011, Messrs. Pearson and Shacknai met in New York City. Also in attendance in person were Jason D. Hanson, Executive Vice President, Chief Operating Officer of Medicis, Spencer Davidson, Medicis' lead independent director, and G. Mason Morfit, a member of VPII's board of directors. There, Mr. Pearson told Messrs. Shacknai, Hanson and Davidson that, following its preliminary due diligence efforts, VPII was no longer prepared to propose a transaction at $48 per share, but was prepared to continue to discuss a potential acquisition of Medicis at a purchase price of $43 per share plus a contingent value right, or CVR, based on certain to-be-developed commercial achievement thresholds. Mr. Pearson also indicated that it was possible that VPII could be in a position to revise its indication of interest to offer $45 per share in cash upfront with no CVR. The indication of interest was subject to further diligence and negotiation of definitive documentation.

On August 7, 2011, the board held a telephonic meeting with representatives of Medicis management, Latham & Watkins, Weil and Deutsche Bank in attendance for portions of the meeting. The board received updates from management regarding the potential transaction with VPII, including VPII's verbal indication that had been communicated to Messrs. Shacknai, Hanson and Davidson at the meeting two days earlier. Representatives of Latham & Watkins and Weil again reviewed with the board its fiduciary duties in connection with its consideration of the proposed transaction with VPII. The closing price of Medicis' common stock on August 5, 2011, the last trading day prior to the board meeting, was $32.09. Following discussion and deliberation and taking into account the decrease in VPII's verbal indication of interest as compared to the levels initially indicated and considering other factors, including the recent decline in VPII's common stock price, the board instructed management to terminate further discussions regarding the potential transaction with VPII because of uncertainty regarding VPII's willingness to execute a transaction at a sufficiently attractive purchase price. The board also discussed and approved a stock repurchase plan, which we refer to as the stock buyback plan, pursuant to which Medicis would be authorized to repurchase up to $200 million of its common stock.

On August 8, 2011, Medicis closed the data room to VPII.

After the close of the markets on August 8, 2011, Medicis issued a press release announcing the board's approval of the stock buyback plan described above and Medicis' financial results for the second fiscal quarter of

28

[Table of Contents](#)

2011. The press release reported that Medicis' revenues and diluted earnings per share increased from the previous fiscal quarter and were in line with Medicis' previously published guidance. In addition, Medicis disclosed that the guidance incorporated Medicis' decision to stop shipment of SOLODYN in its "legacy strengths" (45 mg, 90 mg, and 135 mg) to wholesalers associated with the anticipated November 2011 launch of generic versions of SOLODYN in the legacy strengths. As a result, Medicis lowered its earnings guidance for the third quarter of 2011 and the low end of the range of guidance for the fourth quarter of 2011 to account for the expected decrease in sales and profitability of SOLODYN. Later in the day on August 8, 2011, a report from an anonymous source appeared in the press claiming that VPII had approached Medicis regarding a potential acquisition. Following the announcement of earnings and the stock buyback plan, the closing price of Medicis' common stock increased from $33.63 at the close of the markets on August 8, 2011 to $37.34 at the close of the markets on August 9, 2011.

In early September 2011, representatives of a private equity firm, which we refer to as Financial Sponsor A, contacted members of Medicis' senior management, including Mr. Shacknai, on an unsolicited basis to discuss the possibility of a potential collaboration or joint venture between Medicis and Financial Sponsor A. Financial Sponsor A had previously contacted members of Medicis' senior management, including Mr. Shacknai, on an unsolicited basis, in the Spring of 2011 to discuss such a potential collaboration or joint investment opportunity, with discussions between the parties continuing from time to time thereafter. During the preliminary discussions in September 2011, Financial Sponsor A for the first time verbally expressed an interest in potentially acquiring Medicis through a leveraged buyout transaction at a price between $45 and $50 per share, subject to due diligence and other conditions. In the days that followed, Mr. Shacknai spoke by telephone with each of the members of the board regarding the indication of interest received from Financial Sponsor A and advised the members of the board that he believed Financial Sponsor A was interested in pursuing a possible acquisition transaction. The members of the board requested that management and Medicis' advisors negotiate a non-disclosure agreement with Financial Sponsor A and commence discussions regarding a potential acquisition of Medicis. On September 15, 2011, Medicis entered into a non-disclosure agreement with Financial Sponsor A that included customary standstill and non-solicitation provisions, along with restrictions on Financial Sponsor A's ability to contact financing sources. On September 29, 2011, representatives of Financial Sponsor A delivered a preliminary diligence list requesting certain financial and product information relating to Medicis. On October 3, 2011, Financial Sponsor A and its advisors were granted access to a separate data room tailored to Financial Sponsor A's diligence requests. Representatives of Latham & Watkins worked with Medicis management to populate the data room with additional documents responsive to Financial Sponsor A's diligence requests on a rolling basis. In the weeks following October 3, 2011, Financial Sponsor A conducted its preliminary due diligence review of Medicis, including a review of information in the data room and discussions with management regarding Medicis' business, including presentations delivered by Medicis senior management regarding Medicis' business.

At a regular meeting of the board held on October 6, 2011 in New York City, the board discussed, among other matters, Medicis' interest in participating in the upcoming bankruptcy auction for substantially all of the U.S. and Canadian pharmaceutical assets of Graceway Pharmaceuticals, LLC, or Graceway, which such participation had been previously discussed and authorized at a meeting of the board held on August 25, 2011. Following discussion, the board authorized management to continue to participate in such bankruptcy auction. In addition, management provided an update to the board regarding the ongoing discussions with Financial Sponsor A. Following discussion, the board authorized management to continue to engage in discussions with Financial Sponsor A and reminded management to refrain from any discussions regarding the employment of members of management following the closing of a transaction or their participation in the equity ownership of any post-transaction entity. During October and November 2011, members of Medicis' management continued to have periodic discussions with Financial Sponsor A regarding a potential acquisition of Medicis.

29

**Table of Contents**

After the close of the markets on November 8, 2011, Medicis issued a press release announcing its financial results for the third fiscal quarter of 2011. In the November 8, 2011 earnings release, Medicis reported that revenues and diluted earnings per share had both decreased as compared to the preceding fiscal quarter, but were still within the range of guidance issued by Medicis in its August 8, 2011 earnings release. Medicis adjusted its public earnings guidance for the fourth fiscal quarter of 2011 to decrease the high end of the range of revenues from $207 million to $200 million, and the high end of the range of earnings per share from $0.75 to $0.69. Medicis also announced that it was actively engaged in a multi-year contracting strategy in an effort to reduce its exposure to managed care restrictions for SOLODYN and Medicis' other therapeutic products, which strategy would include, among other things, negotiating new, multi-year contracts to begin in 2012 with targeted managed care organizations and pharmacy benefits managers, which, in aggregate, accounted for approximately 40% of the insurable lives for Medicis' therapeutic products. Medicis noted that the guidance offered did not account for changes in levels of managed care rebates and the associated impacts on Medicis' products. Medicis' common stock price closed at $37.80 on November 8, 2011 and at $36.26 on November 9, 2011, and declined during the following two weeks, closing at $32.67 on November 17, 2011, and $29.93 on November 25, 2011.

Prior to the open of the markets on November 18, 2011, Medicis issued a press release announcing its successful bid to acquire the Graceway assets and its entry into an asset purchase agreement with Graceway and certain of Graceway's subsidiaries, pursuant to which Medicis would acquire substantially all of the assets of the sellers for an aggregate purchase price of approximately $455 million and would agree to assume certain limited post-closing liabilities, but would not assume any of Graceway's debt, which the board had approved at a special meeting held on November 17, 2011. The closing price of Medicis' common stock on November 18, 2011 was $31.84, down from the November 17, 2011 closing price of $32.67.

At a special meeting of the board held on November 20, 2011, the board received an update from management regarding discussions of a potential transaction with Financial Sponsor A. Representatives of Latham & Watkins and Weil again reviewed with the board its fiduciary duties in connection with consideration of a possible transaction. Following discussion and deliberation, the board authorized management to continue discussions regarding the potential transaction with Financial Sponsor A and to provide additional confidential due diligence materials that had been requested by Financial Sponsor A. During the following weeks, Financial Sponsor A continued its due diligence review of Medicis and participated in in-person due diligence meetings with certain senior members of Medicis management to discuss Medicis' finance, accounting and business operations.

At a special telephonic meeting of the board held on December 11, 2011, Medicis' management provided an update to the board regarding its ongoing discussions with Financial Sponsor A. Representatives of Latham & Watkins and Weil again reviewed with the board its fiduciary duties in connection with the transaction. The board then revisited the topic of formal engagement of Deutsche Bank as financial advisor in connection with a potential transaction given that negotiation of an engagement letter with Deutsche Bank had been suspended at the time of the termination of discussions with VPII in August 2011. In addition, the board and management discussed the engagement of Roberts Mitani, LLC, or Roberts Mitani, as an additional advisor in connection with a potential strategic transaction because of a long-standing relationship between a member of Roberts Mitani and Medicis, as well as that member's relationships in the specialty pharmaceutical industry. Following discussion, the board authorized management to formally engage Deutsche Bank and Roberts Mitani as Medicis' financial advisors and to negotiate engagement letters with Deutsche Bank and Roberts Mitani on reasonable terms consistent with current market practice in connection with the board's consideration of strategic alternatives available to Medicis, including a potential sale of Medicis. On December 22, 2011, Medicis entered into an engagement letter with Deutsche Bank pursuant to which Deutsche Bank would provide advisory and investment banking services with respect to a possible transaction, including a potential sale of Medicis. On February 16, 2012, Medicis entered into a formal engagement letter with Roberts Mitani pursuant to which Roberts Mitani would provide additional advisory services with respect to a possible transaction, including a potential sale of Medicis.

30

Table of Contents

On December 16, 2011, Financial Sponsor A submitted a preliminary non-binding offer to acquire 100% of the shares of Medicis for $43 in cash and a CVR, with the CVR to become payable only upon achievement of a number of thresholds based upon the performance of Financial Sponsor A's investment in Medicis. Financial Sponsor A indicated a tentative four-week timeline for completion of due diligence and arrangement of debt financing commitments.

At a special telephonic meeting of the board held on December 23, 2011, Medicis' management provided a further update to the board regarding its ongoing discussions with Financial Sponsor A and summarized the preliminary non-binding offer submitted by Financial Sponsor A. Representatives of Deutsche Bank reviewed with the board certain financial information relating to the preliminary non-binding offer received from Financial Sponsor A. Taking into account the board's assessment of management forecasts, including probabilities associated with achievement of revenues related to pipeline products, discounting the future value of potential CVR payments and additional financial information reviewed by Deutsche Bank, the board determined that the CVR, as proposed, represented only highly speculative consideration to Medicis' stockholders. The board authorized management to continue to engage in discussions related to the potential transaction with Financial Sponsor A, with the goal of improving the terms of the preliminary non-binding offer and increasing the potential value of the CVR to stockholders. Also at the December 23, 2011 meeting, management presented to the board an update on its progress with respect to Medicis' previously announced strategy to reduce its exposure to managed care restrictions for SOLODYN and Medicis' other therapeutic products.

Following the December 23, 2011 board meeting, Medicis and its advisors engaged in a number of discussions with Financial Sponsor A with the objective of improving the cash and CVR consideration proposed by Financial Sponsor A. Medicis and its advisors suggested that Financial Sponsor A propose a CVR structure that included certain lower revenue thresholds and that were several, such that achievement of one or more, but not all, of such thresholds would result in cash consideration payable to Medicis stockholders. Financial Sponsor A delivered additional written preliminary non-binding offers on December 30, 2011, January 6, 2012, and January 12, 2012, each with the same upfront cash consideration per share but with various changes to the proposed CVR terms. Throughout these discussions, Financial Sponsor A also indicated an inability to increase the upfront cash consideration per share offered to Medicis stockholders, in part because uncertainty in the debt financing market at that time would have made securing debt financing more difficult and costly.

On January 15, 2012, the board held a special telephonic meeting to receive updates from Medicis' management and Deutsche Bank regarding their discussions with Financial Sponsor A. At the January 15, 2012 meeting, Mr. Shacknai and representatives from Deutsche Bank provided a summary of events since the December 23, 2011 board meeting, and Deutsche Bank discussed with the board certain financial information regarding the various preliminary non-binding offers received to date from Financial Sponsor A. Representatives of Deutsche Bank explained that the various changes to the terms of the CVR proposed by Financial Sponsor A continued to impose a binary aggregate revenue requirement that was unlikely to be achieved based on management estimates. The board authorized management to continue to engage in discussions with Financial Sponsor A, with the goal of improving the terms of Financial Sponsor A's preliminary non-binding offer and increasing the potential value to stockholders of the CVR, and requested that management update the board with respect to any material developments in such discussions with Financial Sponsor A. In addition, at the January 15, 2012 meeting, representatives of Deutsche Bank reviewed with the board a list of potential financial sponsors and strategic buyers. Following discussion regarding, among other things, competitive sensitivity to providing due diligence information to potential strategic buyers and financial sponsors associated with competitors, the board requested that Deutsche Bank and management contact two additional potential financial sponsors, which we refer to as Financial Sponsor B and Financial Sponsor C, to gauge their interest in a potential acquisition of Medicis.

Following the January 15, 2012 board meeting, and while discussions were ongoing with Financial Sponsor A, Deutsche Bank contacted Financial Sponsor B and Mr. Shacknai contacted Financial Sponsor C, which sponsors were considered, taking into account the factors discussed by the board, to most likely be interested in,

31

Table of Contents

and capable of executing, a potential acquisition of Medicis. In response to such inquiries, each of Financial Sponsor B and Financial Sponsor C separately indicated that it might be interested in a potential acquisition of Medicis and Financial Sponsor B indicated a potential price in the mid- to high-$40s per share. Financial Sponsor C indicated that the acquisition might be challenging due to the size of the investment, and that it would likely be interested in exploring a partnership with another financial sponsor to submit a joint proposal, which it was advised it could not do at that time.

On January 18, 2012 and January 19, 2012, Medicis entered into non-disclosure agreements with Financial Sponsor B and Financial Sponsor C, respectively, each containing customary standstill and non-solicitation provisions similar to those agreed to by Financial Sponsor A. Financial Sponsors B and C and their respective advisors were granted access to separate data rooms on January 19, 2012, and representatives of Latham & Watkins, Deutsche Bank and management of Medicis populated each data room with documents responsive to various diligence requests from the respective financial sponsors during the remainder of January 2012. In late January 2012, Financial Sponsor B verbally indicated to Deutsche Bank that it would potentially be interested in an acquisition of Medicis at a purchase price in the range of $44 to $46 per share, subject to further due diligence and other conditions such as negotiation of definitive documentation and securing of financing commitments. At a special telephonic meeting of the board held on February 2, 2012, Medicis' management provided an update to the board regarding discussions and negotiations with Financial Sponsors A, B and C concerning a potential acquisition of Medicis and their respective due diligence efforts to date. Mr. Shacknai and Medicis' legal and financial advisors provided a summary of events since the January 15, 2012 board meeting, and following full discussion, the board authorized management to continue to explore a potential transaction with each of the financial sponsors and to report back to the board with material developments.

During the weeks following the February 2, 2012 board meeting, Financial Sponsor A, Financial Sponsor B and Financial Sponsor C continued to engage in due diligence review of Medicis and due diligence discussions with Medicis senior management. During this time period, Financial Sponsor C indicated that it was not able to proceed with the transaction due to the size of the transaction but noted that if it were to proceed, it would likely be at a maximum price of $44 to $45 per share and Financial Sponsor A indicated to Deutsche Bank that it wanted to partner with another financial sponsor, that doing so would potentially enable it to increase the price it would be able to pay, and suggested that it thought Financial Sponsor C would be an appropriate partner for such purposes. Following a discussion with representatives of Deutsche Bank regarding Financial Sponsor A's request and the fact that Financial Sponsor C had previously expressed interest in partnering with another financial sponsor and subsequently dropped from the process, Medicis granted permission to Financial Sponsors A and C to engage in discussions with each other regarding a potential joint offer to acquire Medicis and to exchange information regarding Medicis, subject to the terms of their respective non-disclosure agreements with Medicis. At a regular meeting of the board held on February 23, 2012, among other topics of discussion and corporate actions taken in the ordinary course, the board received an update from management regarding strategic alternatives available to Medicis, including the ongoing discussions with the financial sponsors, and the board authorized management to continue discussions and negotiations with the financial sponsors regarding a potential transaction.

Following the board meeting on February 23, 2012, Financial Sponsor B informed Deutsche Bank that Financial Sponsor B would be removing itself from further discussions and would not be able to make an offer to acquire Medicis within the range of $44 to $46 per share it had previously indicated. Access to its data room was closed for Financial Sponsor B on February 24, 2012. Thereafter, following their due diligence on Medicis, Financial Sponsors A and C also indicated that they would be removing themselves from further discussions regarding a potential acquisition of Medicis, citing concerns regarding the managed care environment, Medicis' business and the industry generally, and an inability to make an offer to acquire Medicis within the range of $45 to $50 per share initially indicated by Financial Sponsor A or to deliver a significant premium to Medicis stockholders given the current trading price of Medicis' common stock, which closed at a price of $33.81 on both February 24 and February 27, 2012, and increased to a closing price of $35.72 on February 28, 2012. Access to the respective data rooms for Financial Sponsors A and C was closed on March 8, 2012.

32

**Table of Contents**

After the close of the markets on February 27, 2012, Medicis issued a press release announcing financial results for the fourth fiscal quarter of 2011 and fiscal year end 2011. Medicis' reported revenues and diluted earnings per share for both periods were in line with its published guidance. In the February 27, 2012 earnings release, Medicis also issued public guidance for 2012, indicating that it expected revenues to increase quarter-to-quarter in 2012, in general, and for fiscal year 2012 revenues to be higher than for fiscal year 2011. Medicis offered mixed guidance regarding its diluted earnings per share, indicating that it expected diluted earnings per share to be lower for the first half of 2012 than the diluted earnings per share achieved in the first half of 2011, but expected diluted earnings per share in the second half of 2012 to compare favorably to the actual diluted earnings per share achieved in the second half of 2011, such that the overall guidance for fiscal year 2012 diluted earnings per share was expected to exceed the actual results from fiscal year 2011. Medicis' common stock price closed at $33.81 on February 27, 2012 and at $35.72 on February 28, 2012, and increased over the following weeks, closing at $37.59 on March 30, 2012.

In late February 2012, representatives of VPII contacted Deutsche Bank by telephone and indicated that they remained interested in a potential acquisition of Medicis and anticipated being able to propose a per share purchase price consistent with their August 2011 indication of interest, subject to further diligence and other conditions. A representative of Deutsche Bank notified Mr. Shacknai of the call received from VPII, and thereafter Mr. Shacknai spoke by telephone with each of the members of the board with respect to the possibility of a renewed indication of interest from VPII, and the members of the board gave their approval to provide access to VPII to additional due diligence materials, subject to appropriate withholding and redactions to protect sensitive business and proprietary information, and to further discussions with VPII regarding a potential acquisition transaction. On February 27, 2012, Medicis entered into an amendment to the non-disclosure agreement with VPII to extend the period of the standstill provision. On March 7, 2012, VPII sent a written supplemental diligence request list to Medicis, and representatives of Deutsche Bank, Latham & Watkins and Medicis management worked to populate the VPII data room with additional documents responsive to such requests, withholding or redacting certain information to protect sensitive business and proprietary information. VPII's access to the data room was reinstated on March 10, 2012. Following a brief additional diligence review, VPII indicated that it would not be making an offer to acquire Medicis, citing a different outlook with respect to Medicis' products than that held by Medicis management and the fact that VPII would not be able to offer a per share purchase price consistent with what VPII had proposed in August 2011. VPII's access to the data room was again closed on March 15, 2012.

After the close of the markets on May 8, 2012, Medicis issued a press release announcing financial results for the first fiscal quarter of 2012. Medicis reported revenues and diluted earnings per share that exceeded Medicis' previously published guidance. In the press release, Medicis revised down its public earnings guidance for the second fiscal quarter of 2012, from a range of $197 million to $208 million to a range of $185 million to $195 million. However, on account of first fiscal quarter results that exceeded previous guidance, Medicis revised its overall published earnings guidance upwards for the full fiscal year 2012, replacing the prior range of $817 million to $861 million in revenue with an updated expected range of $830 million to $862 million in revenue. On May 8, 2012, Medicis' common stock price closed at $37.51, down from a closing price of $37.66 on May 7, 2012.

On May 12, 2012, Medicis issued a press release announcing an offering of $500 million in aggregate principal amount of convertible senior notes due 2017, which we refer to as the Convertible Notes Offering. The board authorized the transaction in order to replenish Medicis' cash position following the purchase of the Graceway assets and Medicis' stock buyback plan, and intended the proceeds to be used for general corporate purposes, including potential future transactions. In connection with the Convertible Notes Offering, Medicis entered into privately negotiated convertible note hedge transactions, which we refer to as the DB Note Hedge Transactions, and privately negotiated warrant transactions, which we refer to as the DB Warrant Transactions, with Deutsche Bank AG, London Branch, which we refer to as the DB Option Counterparty, an affiliate of Deutsche Bank, on May 10 and May 12, 2012.

33

Table of Contents

In early May 2012, and as it had done from time to time during the past several years in consultation with members of the board, Medicis' management requested a representative from Roberts Mitani to contact the chief executive officer of a publicly traded corporation in the pharmaceutical industry, which we refer to as Strategic Party A, to express Medicis' interest in potentially acquiring certain dermatological products and assets of Strategic Party A. During the telephone conversation, and unsolicited by the representative of Roberts Mitani, the chief executive officer of Strategic Party A expressed for the first time an interest in potentially acquiring Medicis, but did not give any indication as to a potential purchase price. The representative from Roberts Mitani informed certain members of Medicis management, including Mr. Shacknai, of the conversation with the chief executive officer of Strategic Party A. After having been advised by the representative of Roberts Mitani that Strategic Party A might be interested in a potential acquisition of Medicis, Mr. Shacknai separately contacted each of the members of the board to relay the discussions between Roberts Mitani and the chief executive officer of Strategic Party A, and the board members authorized senior management to contact the chief executive officer of Strategic Party A regarding a potential transaction, and, following entry into a non-disclosure agreement with Strategic Party A, to begin preliminary discussions with Strategic Party A regarding a potential acquisition of Medicis and to provide certain due diligence materials to facilitate the delivery of an acquisition proposal from Strategic Party A.

On May 21, 2012, Medicis entered into a non-disclosure agreement with Strategic Party A that included certain customary standstill and non-solicitation provisions and restrictions on contacts with potential financing sources substantially similar to the provisions contained in the VPII non-disclosure agreement. Over the following weeks, exploratory discussions regarding a potential acquisition of Medicis ensued between senior management of Medicis and senior management of Strategic Party A, including an in-person meeting between the senior management teams of both companies at a hotel in Scottsdale, Arizona on May 23, 2012. Throughout the second half of May 2012, Mr. Shacknai provided periodic updates to members of the board regarding the ongoing discussions with Strategic Party A.

On May 31, 2012, the board held its regular quarterly meeting at which, among other topics of discussion and corporate action, the board received an update from management regarding discussions with Strategic Party A, and authorized Medicis management and Medicis' advisors to continue such discussions. In addition, the board discussed that, as a result of the contractual provisions of the DB Note Hedge Transactions, the possibility existed that the DB Option Counterparty could recognize a contractual benefit under the terms of the DB Note Hedge Transactions in connection with a merger or other change of control transaction involving Medicis and, in light of the fact that Deutsche Bank would be acting as financial advisor to Medicis in connection with a potential transaction with Strategic Party A, directed management of Medicis to negotiate a settlement with the DB Option Counterparty that would substantially reduce, and potentially eliminate, any anticipated benefit to the DB Option Counterparty.

On June 1, 2012, Strategic Party A communicated a verbal expression of interest to a representative of Roberts Mitani to acquire Medicis at a purchase price in the range of $43 to $45 per share, subject to further due diligence and other customary conditions. Following discussions with Medicis' senior management, a representative of Roberts Mitani encouraged Strategic Party A to present a revised verbal expression of interest at a higher per share purchase price. Discussions with Strategic Party A and Strategic Party A's due diligence with respect to Medicis continued over the following days, and on June 4, 2012, Strategic Party A communicated a revised verbal expression of interest to acquire Medicis at a purchase price in the range of $45 to $50 per share, subject to further diligence and other conditions.

In early June, at the direction of the board, management of Medicis and its legal advisors began to engage in discussions with Deutsche Bank regarding settlement arrangements to be entered into between Medicis and the DB Option Counterparty in connection with the DB Note Hedge Transactions and the DB Warrant Transactions entered into during the time of Medicis' Convertible Notes Offering. Discussions continued between the parties regarding such settlement of the DB Note Hedge Transactions and the DB Warrant Transactions over the following weeks.

34

Table of Contents

On June 6, 2012, the board held a special telephonic meeting including Medicis' management and legal and financial advisors. At the meeting, management provided an update to the board regarding the continuing due diligence investigation being conducted by Strategic Party A on Medicis and Strategic Party A's verbal expression of interest on June 4, 2012 in acquiring Medicis at a purchase price in the range of $45 to $50 per share. Representatives of Latham & Watkins reviewed with the board its fiduciary duties with respect to a potential transaction with Strategic Party A. Following discussion, the board authorized management and its advisors to continue discussions and negotiations with Strategic Party A. In addition, the board discussed the DB Note Hedge Transactions and the DB Warrant Transactions, and following such discussion, authorized management to enter into a settlement agreement.

On June 7, 2012, Strategic Party A was granted access to a data room and management of Medicis and Latham & Watkins populated the data room on a rolling basis with specific information in response to further diligence requests received from Strategic Party A and its legal counsel over the following weeks, withholding or redacting certain information to protect sensitive business and proprietary information.

On June 11 and June 12, 2012, additional in-person meetings were held between members of the respective senior management teams of Medicis and Strategic Party A at a hotel in Scottsdale, Arizona.

On June 13, 2012, the chief executive officer of Strategic Party A delivered a letter to Mr. Shacknai indicating that, based on due diligence review to date and review of publicly available information, Strategic Party A would be prepared to acquire 100% of Medicis' outstanding common stock for a purchase price of between $46 and $48 per share in cash, which represented a premium of approximately 33% and 39% over the closing price of Medicis' common stock on June 12, 2012 of $34.46 per share, subject to confirmation of arrangement of the necessary financing and further due diligence review which was estimated to be completed within four weeks.

Following receipt of this preliminary indication of interest from Strategic Party A, a special telephonic board meeting including members of Medicis' management and legal and financial advisors was held on June 14, 2012, at which management provided an update to the board on continued discussions with Strategic Party A. Following discussion, the board authorized management and its advisors to continue discussions and negotiations with Strategic Party A, to allow Strategic Party A to access additional diligence materials that it had requested, and to permit Strategic Party A to enter into preliminary discussions with potential financing sources subject to the terms of the Strategic Party A non-disclosure agreement. During the remainder of June 2012, Strategic Party A continued to engage in a due diligence review of Medicis.

On June 28, 2012, the board held a special telephonic meeting including Medicis' management and legal and financial advisors, at which the board received an update from management regarding discussions with Strategic Party A. Representatives of Deutsche Bank presented certain financial information relating to Strategic Party A's preliminary indication of interest, and representatives of Latham & Watkins and Weil reviewed with the board its fiduciary duties in connection with consideration of such a transaction. Following discussion the board authorized management to continue to engage in discussions with Strategic Party A and requested that management report back to the board with any material developments in those discussions.

Discussions between representatives of Medicis and Strategic Party A regarding Strategic Party A's due diligence and the terms of a potential transaction continued during this time period, including an in-person meeting in New York City on June 20, 2012 involving certain members of senior management of Medicis and board members of Strategic Party A, to discuss the potential acquisition of Medicis by Strategic Party A, the terms of such potential acquisition, and the business prospects and plans of Medicis. Strategic Party A continued to engage in due diligence of Medicis and further discussions over the next several weeks.

On July 19, 2012, upon completion of its due diligence efforts, Strategic Party A communicated a revised preliminary non-binding indication of interest reflecting a purchase price of $30 per share in cash plus an

35

Table of Contents

additional $10 per share payable in the form of common stock of Strategic Party A valued at the time of signing. The closing price of Medicis' common stock on July 19, 2012 was $35.38.

On July 25, 2012, the board held a special telephonic meeting including Medicis' management and legal and financial advisors. Mr. Shacknai reviewed with the board a history of Medicis' discussions with Strategic Party A. Representatives of Deutsche Bank and Roberts Mitani discussed Strategic Party A's most recent preliminary non-binding indication of interest with the board, noting that Strategic Party A had indicated that it would likely not be in a position to increase its indication of interest. Following discussion and deliberation, the board instructed management to terminate further discussions with Strategic Party A at this time because the consideration offered by Strategic Party A was inadequate, a belief that Strategic Party A's board of directors was not fully supportive of an acquisition of Medicis, and the board's judgment that continuing such discussions would not be in the best interest of Medicis and its stockholders. Strategic Party A's access to the data room was closed on July 26, 2012.

Following termination of discussions with Strategic Party A, the board continued to consider various strategic initiatives and alternatives available to Medicis. On August 7, 2012, the board approved an extension of the stock buyback plan, which was initially set to expire on that day, until February 7, 2013. At that time, approximately $50 million remained available to use for the repurchase of shares under the stock buyback plan.

After the close of the markets on August 8, 2012, Medicis issued a press release announcing financial results for the second fiscal quarter of 2012. In the August 8, 2012 earnings release, Medicis reported revenue and earnings per share figures that were within the range of the previously published guidance for the second quarter of 2012. In the earnings release, Medicis also revised its revenue and diluted earnings per share guidance down for the third and fourth quarters of 2012, and for the fiscal year 2012. Specifically, Medicis lowered full-year 2012 revenue guidance from a range of $830 million to $862 million to a range of $800 million to $834 million, and diluted earnings per share guidance from a range of $2.62 to $2.86 to a range of $2.25 to $2.65. Following the earnings announcement, the closing price of Medicis' common stock decreased from $33.31 on August 8, 2012 to $31.95 on August 9, 2012.

During mid-August 2012, Mr. Pearson, without prior solicitation from Medicis or its advisors, contacted representatives of Deutsche Bank to communicate that VPII may be interested in renewing discussions with Medicis regarding a potential strategic transaction. Mr. Pearson and representatives of Deutsche Bank had several discussions over the following weeks regarding VPII's potential interest in an acquisition of Medicis, and representatives of Deutsche Bank informed members of Medicis' senior management, including Mr. Shacknai, of such discussions.

On August 24, 2012, Mr. Pearson contacted Mr. Shacknai to communicate that VPII was interested in a potential transaction with Medicis, and that VPII would be delivering written correspondence to that effect later that day. VPII thereafter delivered a preliminary non-binding written proposal to Medicis to acquire 100% of the outstanding common stock of Medicis at a price of $42 per share in cash, subject to confirmatory due diligence regarding several areas of Medicis' business, and further subject to negotiation and execution of definitive transaction documents, all of which VPII proposed could be completed within one week. The preliminary non-binding proposal provided that VPII's proposed transaction would not be subject to a financing contingency, but that the proposal was contingent upon exclusive discussions between the two companies regarding the proposed transaction through September 3, 2012, the time period necessary for VPII to complete its due diligence. During the evening of August 24, 2012, representatives from Sullivan & Cromwell LLP, or Sullivan & Cromwell, counsel to VPII, delivered an initial draft of a proposed merger agreement to Medicis.

On August 25, 2012, the board held a special telephonic meeting including Medicis' management and certain of Medicis' legal and financial advisors. At the meeting, management informed the board of the renewed discussions with VPII, including the terms of VPII's preliminary non-binding proposal. A discussion ensued regarding the preliminary non-binding proposal, the potential for VPII to increase the economic terms of its

36

**Table of Contents**

proposal, the fact that VPII's proposal was not subject to any financing condition, VPII's request for exclusivity, the potential to contact the other parties that had previously expressed interest in acquiring Medicis during the prior fourteen-month period and the ability of such parties to reengage in the process and come forward with a competitive offer, VPII's acquisition activity and track record during that time period, potential uncertainty in Medicis' business moving forward in light of risks related to the managed care environment and implementation of Medicis' alternate fulfillment initiatives, and various other considerations. After discussion, the board determined that the current written proposal of $42 per share in cash was not compelling, and requested that management make a counterproposal at $46 per share in cash to VPII. The board also authorized management to continue to engage in discussions with VPII regarding the proposed transaction and directed management to reject VPII's request for exclusivity. In addition, the board determined that, in light of the accelerated timetable to negotiate a transaction with VPII, the sale processes conducted by Medicis over the past fourteen months, the fact that all of the other parties with which Medicis had discussed a potential sale had either significantly decreased their offer consideration or had elected not to make a definitive offer to acquire Medicis, the desire to keep a potential transaction with VPII highly confidential, and the fact that a definitive merger agreement with VPII would contain customary provisions permitting the board to consider and ultimately accept a superior offer from a third party to acquire Medicis (subject to the terms and conditions of the merger agreement, including payment of the termination fee), neither management nor its advisors should attempt to reengage with the other parties with which Medicis had previously discussed a potential sale at that time.

On August 25 and 26, 2012, at the request of the board, Mr. Shacknai commenced negotiations with Mr. Pearson informing him of the $46 per share counterproposal. Mr. Shacknai also rejected VPII's request for exclusivity. Following discussions among the chief executive officers of Medicis and VPII, on the evening of August 25, 2012, VPII agreed to increase its offer price to $43 per share. Negotiations between Mr. Shacknai and Mr. Pearson continued and on August 26, 2012, Mr. Pearson communicated that VPII would be willing to support a transaction at $44 per share in cash. Upon receipt of VPII's increased offer, Mr. Shacknai contacted each member of the board to inform them of progress in discussions since the most recent full board meeting and that VPII was interested in a transaction at $44 per share in cash on the proposed one-week timeline. The board members authorized continued discussions and negotiation of definitive documentation with VPII, and requested a financial presentation regarding VPII's proposed acquisition at a board meeting to be held later in the week. Throughout the remainder of the week leading up to the board meeting, Mr. Shacknai had regular contact with members of the board to provide updates on progress and key issues in negotiations regarding the proposed transaction with VPII.

VPII was granted access to a newly created data room on August 26, 2012 and, continuing on a rolling basis thereafter, representatives of Latham & Watkins, with the assistance of Medicis' management, populated the data room with additional non-public information regarding Medicis, with certain information being withheld or redacted to protect sensitive business and proprietary information. On August 27, 2012, Medicis entered into a second amendment to the non-disclosure agreement with VPII to extend the period of the standstill provision. During the following days, VPII and its advisors engaged in its due diligence review of Medicis and participated in numerous due diligence calls with members of Medicis' senior management and Medicis' advisors to discuss Medicis' finance, legal, accounting and business operations.

Between August 26, 2012 and September 2, 2012, representatives of Latham & Watkins, Weil, Sullivan & Cromwell and Skadden, Arps, Slate, Meagher & Flom LLP, or Skadden, counsel to VPII regarding antitrust and financing matters, engaged in extensive negotiations regarding the merger agreement and related financing commitments. In addition, Messrs. Pearson and Shacknai discussed and negotiated various open items related to the merger agreement during this time period. The principal points of negotiation of the terms of the merger agreement included the scope of Medicis' representations and warranties and related disclosure obligations, Medicis' obligation to cooperate with VPII's financing efforts, certain covenants related to antitrust matters and the amount of the termination fee payable by Medicis.

37

**Table of Contents**

VPII initially proposed in the draft merger agreement that the amount of the termination fee should be 4% of the equity value of Medicis, including all outstanding convertible notes of Medicis, or approximately $137 million, plus payment of all documented out-of-pocket expenses incurred by VPII in connection with the transaction. In light of the board's concern that other potential bidders might be deterred by the amount of the termination fee, Medicis proposed lowering the termination fee to 2.5% of the aggregate equity purchase price for the transaction, or approximately $65 million. After extensive negotiation, the parties agreed to a termination fee of $85.0 million, as well as reimbursement for reasonable documented out-of-pocket expenses actually incurred by VPII up to $7.5 million, payable by Medicis to VPII upon termination of the merger agreement in certain circumstances.

In addition, the parties engaged in extensive negotiation regarding the magnitude and scope of the standard for divestiture of businesses and assets required of VPII as necessary to obtain required regulatory approvals. Medicis and its advisors initially proposed a "hell or high water" standard without any monetary divestiture limitation in order to account for any potential remedies that may be imposed by regulatory authorities. In response, Valeant took the position that a "hell or high water" standard was unacceptable and proposed a material adverse effect standard on the required divestitures. After extensive negotiation over the following days, the parties agreed on a monetary divestiture limit of $325 million of annual revenue.

On August 31, 2012, representatives of Sullivan & Cromwell delivered a revised draft of the merger agreement that incorporated the concept of a marketing period in order to address certain proposed requirements in VPII's financing commitment letters. Mr. Pearson also made the request to Mr. Shacknai on a telephone call that same day that the concept of a marketing period be added to the merger agreement. Mr. Shacknai and the representatives of Latham & Watkins responded that a traditional marketing period that only began following the satisfaction of all closing conditions was unacceptable to Medicis as it created additional closing risk. Representatives of Latham & Watkins, Weil, Sullivan & Cromwell and Skadden, as well as Messrs. Shacknai and Pearson, engaged in extensive negotiations regarding the marketing period during the next 36 hours. Also during this time, representatives of Latham & Watkins and Weil negotiated certain terms of the draft financing commitment letters with representatives of Skadden. The parties ultimately agreed to a limited marketing period that could commence at any time, rather than prior to satisfaction of the closing conditions and further agreed that, if, in the unlikely event that the financing had not already been obtained and the marketing period was not completed by April 3, 2013, VPII would use commercially reasonable efforts to obtain amended or new financing commitment letters permitting an extension of the outside date of the financing commitment (which is June 3, 2013) to the extent that the marketing period was begun but not completed by June 3, 2013 and, to the extent obtained, the outside date in the merger agreement would also be extended. See "The Merger Agreement — Structure and Effective Time."

In addition, during this time period, legal counsel for the Company and Deutsche Bank, along with the principals, negotiated and finalized the terms of the settlement agreement, or the DB Settlement Agreement, between Medicis and the DB Option Counterparty in connection with the DB Note Hedge Transactions and the DB Warrant Transactions. For further information regarding the DB Settlement Agreement, see "— Opinion of Deutsche Bank Securities Inc. — General."

On August 31, 2012, the board held a special telephonic meeting including Medicis' management and legal and financial advisors. At the August 31, 2012 board meeting, representatives of Latham & Watkins and Weil reviewed with the board its fiduciary duties with respect to the proposed merger with VPII. Mr. Shacknai and other members of Medicis senior management then provided a summary to the board of the due diligence process undertaken by VPII to date, negotiations and discussions with VPII, and, together with the representatives of Latham & Watkins and Weil, updated the board on the principal provisions of the merger agreement and remaining open items that would need to be addressed in order to finalize the merger agreement, including status of negotiations of the amount of the termination fee and certain provisions related to certainty of closing described above. Management reviewed with the board the principal terms and assumptions in Medicis' business plan and corresponding financial model. Representatives of Deutsche Bank made a presentation with respect to the $44.00 in cash to be paid per share of common stock in the merger. The board discussed Medicis' potential

38

[Table of Contents](#)

strategic alternatives to a merger with VPII, including pursuing Medicis' standalone plan, an additional stock buyback or dividend, and a sale of Medicis to a financial sponsor or another strategic partner, and timing and next steps involved in proceeding with the proposed merger with VPII. The board then met in executive session after dismissing from the meeting representatives of Deutsche Bank and members of Medicis management, with Medicis' legal advisors being invited to remain on the conference call to answer any questions. At the conclusion of the discussion, and after inviting the members of Medicis management to rejoin the meeting, the board requested that management and its advisors continue negotiations with VPII in order to prepare final definitive transaction documents.

From the evening of August 31, 2012 through the afternoon of September 2, 2012, representatives of Latham & Watkins, Weil, Sullivan & Cromwell, Skadden and the management teams of the respective companies engaged in final discussions and negotiations regarding the remaining open items and prepared final definitive transaction documents.

In addition, as part of its due diligence, VPII raised concerns on August 28, 2012 regarding perceived ambiguities in the employment agreement between Medicis and Mr. Shacknai. A variety of conversations between counsel for Mr. Shacknai, Medicis and VPII resulted in a letter agreement between Mr. Shacknai and VPII that was signed on September 2, 2012 setting forth their agreed understanding of the meaning of certain provisions of the employment agreement and the quantification of the amounts owed to Mr. Shacknai upon the termination of his employment in connection with a change of control of Medicis. See "— Interests of Our Directors and Executive Officers in the Merger — Payments Pursuant to the Merger Agreement."

On the evening of September 2, 2012, the board convened a meeting, with all members of the board present. At the invitation of the board, certain members of Medicis management, as well as representatives of Latham & Watkins, Weil, Deutsche Bank and Roberts Mitani, also participated in the meeting. Mr. Shacknai provided an update to the board regarding discussions and events occurring since the August 31, 2012 board meeting. Legal counsel confirmed that members of the board had received and reviewed in advance of the meeting a near-final version of the merger agreement, with such final changes to the definitive merger agreement to be discussed with the board by legal counsel at the meeting, and other related transaction documents, as well as discussion materials provided by Deutsche Bank with respect to the $44.00 in cash to be paid per share of common stock in the proposed transaction. Representatives of Latham & Watkins and Weil then reviewed again with the board its fiduciary duties with respect to the merger with VPII, and summarized the principal terms and conditions contained in the merger agreement and the other VPII transaction documents, highlighting for the board the various provisions impacting certainty of closing of the proposed merger (including the fact that VPII's obligation to close the merger was not subject to VPII's receipt of financing), flexibility of Medicis to operate its business in the ordinary course prior to closing and Medicis' ability to terminate the proposed business combination to pursue alternative, unsolicited proposals upon payment of a termination fee which had been negotiated down from the levels initially proposed by VPII. Referencing its discussion materials circulated prior to the meeting, representatives of Deutsche Bank then reviewed Deutsche Bank's financial analysis of the $44.00 per share in cash offered by VPII and rendered an oral opinion to the board, which was subsequently confirmed by delivery of a written opinion dated September 2, 2012, to the effect that, as of such date, and based upon and subject to the assumptions, limitations, qualifications and factors set forth in its opinion, the merger consideration of $44.00 per share in cash to be received by the holders of Medicis common stock (excluding VPII and its subsidiaries) in the merger was fair from a financial point of view to such holders. See "— Opinion of Deutsche Bank Securities Inc." Representatives of Latham & Watkins then reviewed the final terms of the DB Settlement Agreement. Representatives of Deutsche Bank then dropped from the conference call, and Mr. Shacknai temporarily dropped from the conference call allowing the board to meet in executive session with legal counsel. The remaining members of the board discussed the proposed merger with VPII and, following a full and complete discussion, Mr. Shacknai was invited to rejoin the meeting. After further discussion, the board unanimously approved and declared advisable the merger agreement and the related transaction documents and the DB Settlement Agreement, and resolved to recommend that the holders of Medicis common stock adopt the merger agreement.

39

Table of Contents

Later in the evening on September 2, 2012, the parties executed the merger agreement and the related transaction documents and the DB Settlement Agreement. On the morning of September 3, 2012, the parties issued a joint press release announcing the merger and parties' entry into the merger agreement.

**Recommendation of Our Board of Directors; Our Reasons for the Merger**

*Recommendation of Our Board of Directors*

Our board of directors has unanimously determined that the merger is fair to, and in the best interests of, Medicis and its stockholders and approved and declared advisable the merger agreement, the merger and the other transactions contemplated by the merger agreement.

**Accordingly, our board of directors unanimously recommends that you vote "FOR" the proposal to adopt the merger agreement.**

*Our Reasons for the Merger*

In reaching its decision to approve the merger agreement and the merger, and to recommend that our stockholders adopt the merger agreement, the board of directors of Medicis, with the assistance of our management and advisors, considered other alternative transactions, including contacts and extensive discussions with other potential acquirers. Notwithstanding the vigorous process described above, no other potential acquirers offered a strategic alternative as favorable to Medicis stockholders as the merger with Valeant.

Our board of directors considered a number of positive factors in its deliberations, including:

- The merger consideration consists solely of cash, which provides immediate liquidity and certainty of value to Medicis' stockholders compared to any transaction in which stockholders would receive shares of an acquirer's stock.

- The proposed merger consideration of $44.00 per share of common stock represents a 39.4% premium compared to the closing price of Medicis common stock on August 31, 2012 (the last full trading day prior to the announcement of the merger); as of August 31, 2012, a 33.7% premium compared to the 30-day average price of Medicis common stock; and a 11.8% premium compared to the high of Medicis common stock closing price over the prior 52 weeks.

- The advantages of entering into the merger agreement in comparison with the risks of remaining independent, including our management's views on full year 2012 performance and long-term financial projections as a standalone company, the risks inherent in the pharmaceutical industry, potential changes in laws affecting that industry, the economy and capital markets as a whole, and the various additional risks and uncertainties that are listed in Item 1A of Part I or Part II, as applicable, of our most recent annual and quarterly reports.

- The opinion of Deutsche Bank to the effect that, as of September 2, 2012 and based upon and subject to the assumptions, limitations, qualifications and conditions set forth in Deutsche Bank's written opinion, the merger consideration of $44.00 in cash per share to be received by holders of our common stock (other than VPII and its subsidiaries) in the proposed merger was fair from a financial point of view to such holders. The full text of Deutsche Bank's written opinion, dated September 2, 2012, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Deutsche Bank in connection with the opinion, is included in this proxy statement as *Annex B*. Deutsche Bank's opinion was addressed to, and for the use and benefit of, the Medicis board of directors in connection with and for purposes of its evaluation of the merger. Deutsche Bank's opinion does not constitute a recommendation as to how any holder of Medicis common stock should vote with respect to the merger.

40