UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Q-MED AB, : | |
| : | |
| Plaintiff, : | |
| : | 12 Civ. 8071 (RJS) |
| vs. : | |
| : | |
| HA NORTH AMERICAN SALES AB, : | |
| MEDICIS AESTHETICS HOLDINGS INC., and : | |
| MEDICIS PHARMACEUTICAL CORP., : | |
| : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
OF Q-MED AB FOR A PRELIMINARY INJUNCTION TO PRESERVE THE
<u>*STATUS QUO*</u> DURING THE PENDENCY OF ARBITRATION PROCEEDINGS**

Jyotin Hamid (jhamid@debevoise.com)
Jeremy N. Klatell (jklatell@debevoise.com)
Sok T. Tea (stea@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-1031

*Attorneys for Plaintiff Q-Med AB*

Dated: New York, New York
       November 21, 2012

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Preliminary Statement | 1 |
| Argument | 3 |
| I. Q-Med Is Likely To Succeed On The Merits. | 3 |
|     A. Valeant Is Engaged In Business Involving Hyaluronic Acid Products. | 3 |
|     B. Valeant Is Engaged In Directly Competitive Business. | 3 |
|     C. Valeant Is Engaged In Business Competitive With "New Products." | 6 |
|     D. Valeant's Financial Condition Is Not Comparable To Medicis' In 2004. | 6 |
| II. Absent Injunctive Relief, Q-Med Will Suffer Irreparable Harm. | 8 |
|     A. The Agreements Acknowledge That Q-Med Would Suffer Irreparable Harm. | 8 |
|     B. The Facts Demonstrate That Q-Med Would Suffer Irreparable Harm. | 9 |
|         1. Deprivation Of Contractual Consent Rights. | 9 |
|         2. Loss Of Good Will, Reputation And Market Share. | 10 |
|         3. Disclosure Of Confidential Information To A Competitor. | 12 |
|         4. Q-Med Would Be Prevented From Introducing New Products. | 13 |
| III. Q-Med Also Meets The Alternative Standard For A Preliminary Injunction. | 13 |
| Conclusion | 15 |

**TABLE OF AUTHORITIES**

**CASES**

*Ardis Health, LLC v. Nankivell*,
   No. 11-cv-5013, 2011 WL 4965172 (S.D.N.Y. Oct. 19, 2011)..................................................9

*Consolidated Edison, Inc. v. Northeast Utilities*,
   426 F.3d 524 (2d Cir. 2005).......................................................................................................14

*In re Del Monte Foods Co. Shareholders Litig.*,
   25 A.3d 813 (Del. Ct. Ch. 2011)................................................................................................14

*Empresas Cablevision, S.A.B de C.V. v. JPMorgan Chase Bank, N.A.*,
   680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd* 381 F. App'x 117 (2d Cir. 2010).............9, 10, 11

*In re Faiveley Transport Malmo AB*,
   522 F. Supp. 2d 639 (S.D.N.Y. 2007), *rev'd on other grounds*,
   559 F.3d 110 (2d Cir. 2009)........................................................................................................8

*Int'l Creative Mgmt, Inc. v. Abate*,
   No. 07-cv-1979, 2007 WL 950092 (S.D.N.Y. Mar. 28, 2007)....................................................9

*Metropolitan Taxicab Bd. of Trade v. City of New York*,
   615 F.3d 152 (2d Cir. 2010).......................................................................................................14

*Norcom Elecs. Corp. v. CIM USA Inc.*,
   104 F. Supp. 2d 198 (S.D.N.Y. 2000).........................................................................................8

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co.*,
   339 F.3d 101 (2d Cir. 2003).........................................................................................................9

Q-Med AB ("Q-Med") respectfully submits this reply memorandum of law in further support of its preliminary injunction motion against HA North American Sales AB, Medicis Aesthetics Holdings Inc. and Medicis Pharmaceutical Corporation (together "Medicis").

## **Preliminary Statement**

The parties agree that the proposed acquisition of Medicis by Valeant Pharmaceuticals International, Inc. ("Valeant") would constitute a Change in Control under the license and supply agreements (the "Agreements") between Q-Med and Medicis.  The parties also agree that Q-Med may withhold its consent to a Change in Control resulting in transfer of Medicis' rights if Q-Med "reasonably determines" that any one of five specified conditions exist.  Q-Med has determined that four of the five conditions are present.  Following submission of Medicis' opposition papers, facts which are essentially undisputed demonstrate that Q-Med's determinations are reasonable:

- *First*, Medicis concedes that Valeant is "engaged in a business involving" a hyaluronic acid product: Succeev.  Medicis' attempts to downplay the importance of Succeev are irrelevant; the only relevant question has been conceded.

- *Second*, Medicis cannot escape its own admissions that Valeant is engaged in a directly competitive business.  For example, Medicis' own annual report on Form 10-K admits that Valeant's Sculptra product competes with the Restylane family.  It states:  "We are experiencing intense competition in the dermal filler market.  Other dermal filler products on the market include . . . Sculptra."

- *Third*, Medicis does not dispute that if Sculptra (or Succeev) is competitive with Restylane, it is also competitive with Sub-Q, a "New Product" under the Agreements.

- *Fourth*, Medicis does not contest that Valeant is very highly leveraged, that its credit ratings are weak, and that Medicis in 2004 and Valeant today are at opposite ends of the spectrum of creditworthiness.  Medicis' focus on the fact that Valeant is bigger than Medicis simply ignores Q-Med's legitimate concerns.

Thus, undisputed facts show that, absent an injunction, exclusive rights to market and sell Q-Med's most important products in the most important market in the world would be delivered, over Q-Med's objection, into the hands of a company which markets and sells a hyaluronic acid

product, as well as another product which Medicis' own 10-K identifies as directly competitive, and that independent rating agencies have concluded faces "substantial credit risk" and "major ongoing uncertainties to adverse business, financial and economic conditions." It follows that Q-Med would be irreparably harmed absent injunctive relief. Under Second Circuit precedent, deprivation of important consent rights is inherently irreparable harm. Moreover, being forced to turn over marketing and sale of Q-Med's most important products to a financially unstable direct competitor poses irreparable harm to the reputation, good will and market share enjoyed by Q-Med's products. Similarly, being forced to share confidential information with a direct competitor constitutes irreparable harm.

Unable to muster facts that could plausibly cast doubt on the reasonableness of Q-Med's determinations that four conditions triggering its consent rights are present or that irreparable harm will result from disregard of those consent rights, Medicis instead focuses its attention on trying to impugn Q-Med's motives. Medicis argues that Q-Med's concerns about being forced, against its will, into an exclusive license arrangement with Valeant are "pretextual" and inconsistent with discussions Q-Med's parent, Galderma, has had with Valeant about potential business transactions. In addition to being irrelevant, Medicis' contentions are based on a misleadingly incomplete description of the discussions Galderma has had with Valeant.

As detailed in the declaration of Humberto C. Antunes, while it is true that Galderma has attempted to reach a business resolution with Valeant that would address Q-Med's legitimate concerns, including a possible joint venture, Medicis conspicuously avoids discussing the terms of the joint venture considered: Galderma would be the majority owner with full operational control, Valeant would passively contribute assets, and Galderma would be responsible for the marketing and sale of the products. Galderma has never entertained *any* potential transaction

2

that would involve Valeant having control over the marketing and sale of Q-Med products or that would involve *any* ongoing business entanglement that would make Valeant's financial condition relevant to Q-Med. Whether through litigation or possible business resolutions, Q-Med and Galderma have pursued the same goal of seeking to prevent exclusive control over marketing and sale of the Restylane products from passing into Valeant's hands.

Q-Med and Galderma have behaved responsibly in trying to explore alternate resolutions that would address their legitimate concerns. Such actions hardly constitute "unclean hands," and this Court should recognize Medicis' attempt to hold these discussions against Q-Med for what it is – a desperate effort to distract the Court from the compelling facts at hand.

## Argument

**I.     Q-Med Is Likely To Succeed On The Merits.**

    **A.     Valeant Is Engaged In Business Involving Hyaluronic Acid Products.**

Medicis concedes that Valeant is engaged in a business involving a hyaluronic acid product – namely, Succeev. Schiller Decl. ¶¶ 15-16. None of the points that Medicis makes about Succeev – that its market share is small, that it is not (currently) sold in the U.S., and that Valeant has engaged a distributor to take primary (but not sole) responsibility for marketing and sale of the product, *see id.* – are relevant to the issue at hand. The question is only whether Valeant "is engaged in a business involving" hyaluronic acid. Medicis has conceded this point as to Succeev. On this basis alone, Q-Med may withhold consent.

    **B.     Valeant Is Engaged In Directly Competitive Business.**

Despite its best efforts, Medicis cannot explain away its own admissions, which are dispositive of the question of whether Valeant's Sculptra product competes directly with Q-Med's Restylane family of products. In the section describing Risk Factors, Medicis' Form 10-K for 2011 admits that Sculptra and the Restylane family compete directly:

3

> We are experiencing **intense competition** in the dermal filler market. Other dermal filler products on the market include: Juvederm, Artefill, Belotero, Balance, Radiesse, Elevess, Hydrelle, LAVIV, Prevelle, Silk, and **Sculptra** Aesthetic. Patients may differentiate these products from our RESTYLANE and PERLANE branded products based on price, efficacy and/or duration, which may appeal to some patients.

Langö Decl. Ex. D, p.23 (emphasis added); *see also id.* at p.12. Medicis' own "2013 Brand Plan" for the Restylane family describes Sculptra as being in the same market as, and competing for market share with, the Restylane family. Langö Decl. Ex. E. In light of these admissions in Medicis' own 10-K and brand plan, Medicis cannot plausibly deny that Q-Med was "reasonable" in determining that Sculptra and the Restylane family compete directly.

Medicis' attempts to cast doubt on the reasonableness of Q-Med's determination are unavailing, as further detailed in the Reply Declaration of Per Langö. For example, Medicis argues that its Form 10-K, its 2013 Brand Plan and other documents reflect that Medicis is *most* concerned about competition from Juvederm. *See* Ippolito Decl. ¶¶ 15-17. That may well be. But the fact that Juvederm may be the biggest competitive threat to the Restylane family obviously does not mean that no other product directly competes. Reply Langö Decl. ¶¶ 6-7.

Medicis concedes, as it must, that the FDA-approved indications for the two products are very similar and that the two products are marketed for very similar uses. Opp. Mem. at 30. Medicis argues, however, that the approved uses and marketing of Sculptra are "irrelevant," *see id.*, because off-label use of Sculptra (which Medicis concedes is illegal to condone) differs from the uses which are approved and which Valeant may lawfully market. *See* Wortzman Decl. ¶¶ 22-23. But the fact that Restylane and Sculptra are FDA-approved for almost identical indications, and that any lawful marketing of the products is for similar uses, is a vastly more reliable indicator of how the products are and should be used than Dr. Wortzman's speculations about off-label use. Reply Langö Decl. ¶ 8.

4

Medicis also argues that Sculptra is different from Restylane in that it utilizes a different technology and is marketed as providing a longer-lasting and more gradual effect. *See* Wortzman Decl. ¶¶ 13-20. The fact that the technology is different has no bearing on whether the products compete. The Agreements themselves contemplate that products using different technology can compete directly by providing one trigger for withholding consent if Valeant is engaged in business involving a hyaluronic acid product and a separate trigger if Valeant is engaged in a business involving a directly competitive product that uses a different technology.

The fact that the products have differentiating features that might cause a consumer to pick one over the other tends to show that they are competitive. As Medicis' own Form 10-K filing explains, these differentiating features *are the basis of competition* insofar as they provide reasons that a patient might use Sculptra instead of Restylane. Langö Decl. Ex. D, p.23.

The declaration submitted by Dr. Doris Day (one of thousands of physicians who use Restylane products in North America) is insufficient to show that Q-Med is unreasonable to have determined that Sculptra and the Restylane family compete directly. It may be that Dr. Day uses both Restylane and Sculptra together on the same patients. Such occasional complementary use is not inconsistent with competition. Reply Langö Decl. ¶¶ 14-15. For example, some physicians have used both Juvederm and Restylane on the same patients, yet it is not disputed that Juvederm is Restylane's biggest competitor. *Id.* Moreover, such complementary use is rare, given that it is more expensive, and would be contrary to Sculptra's FDA-approved warning label and Q-Med's written guidance for Restylane users, both of which caution that the products should not be used together. *Id.*

Finally, Medicis relies on misleading uses of irrelevant documents. Medicis "urge[s] the Court to review [] in detail" a Q-Med marketing study attached as Exhibit A to the Ippolito

5

declaration, which Medicis contends is "highly revealing of Q-Med's view of the competitive landscape." Opp. Mem. at 12. But, as the cover page makes clear, the brand assessment study is only about hyaluronic acid (HA) products and covers only seven countries. Given that Sculptra is *not* an HA product and is sold in only one of the seven countries covered by the study, it is hardly surprising that Sculptra is barely mentioned. Similarly, Medicis relies on a third-party market assessment written in 2006, three years *before* Sculptra was approved for mainstream use. *See* Ippolito Decl. Ex. F; *see also* Reply Langö Decl. ¶¶ 16-17.

### C. Valeant Is Engaged In Business Competitive With "New Products."

Medicis concedes that if Sculptra is competitive with Restylane, it is also competitive with Sub-Q. Opp. Mem. at 32. Medicis contends, however, that Sub-Q is not a "New Product" under the Agreements. Medicis' position is untenable under the express language of the Agreements. Section 12.1(c)(iii) of the 2004 License Agreement provides that the term "New Products" shall have the meaning "as such term is defined in the Previous Supply Agreement," *see* Hamid Decl. Ex. A, at § 12.1(c)(iii), with the "Previous Supply Agreement" defined as the 2003 Supply Agreement. *Id.* at § 1.1. Medicis concedes, as it must, that the 2003 Supply Agreement defines Sub-Q as a "New Product." Opp. Mem. at 31.

### D. Valeant's Financial Condition Is Not Comparable To Medicis' In 2004.

Medicis does not dispute that Valeant is very highly leveraged, that its credit ratings are weak, and that Medicis in 2004 and Valeant today are at opposite ends of the spectrum of creditworthiness. Instead of disputing these points – which alone show that Q-Med's determination about the financial conditions of Valeant and Medicis in 2004 is "reasonable" – Medicis simply points out that Valeant is considerably larger than Medicis. Opp. Mem. 26-27.

Bigger is not necessarily better, as further explained in the accompanying declaration of Humberto C. Antunes. Large companies fail. Companies with high leverage fail more often

than companies with less debt because such companies' high leverage can become a major burden and limitation on flexibility should adverse events occur. This is particularly true in the pharmaceutical industry, which is why most major pharmaceutical companies have chosen to maintain very low leverage levels – on average half that of Valeant. Indeed, neither Galderma nor Medicis have any meaningful debt outstanding despite very successful and long-standing operations. For these reasons, in selecting a party to assume exclusive control over marketing and sale of Q-Med's most important products in the most important market in the world, Q-Med is much more concerned with the licensee's leverage than with its size. Antunes Decl. ¶¶ 14-15.[1]

Medicis' contention that Valeant's size will ensure that it can make the estimated $20 million in annual payments owed under the Agreements with Q-Med, *see, e.g.*, Schiller Decl. ¶ 9, is both incorrect and beside the point. The "too big to fail" theory is incorrect because it ignores the meaning of Valeant's weak credit ratings: a significant risk that Valeant may be unable to comply with its debt obligations, leading ultimately to financial failure. According to independent rating agencies, Valeant faces "substantial credit risk" and "major ongoing uncertainties to adverse business, financial and economic conditions." *See* Nicholson Decl. ¶¶ 20-21.

Moreover, Medicis' myopic focus on the estimated $20 million annual payment obligation sidesteps Q-Med's primary concern – that Valeant will not have the wherewithal to make the significant financial investment in marketing, medical education and physician training necessary to maintain the market position of the Restylane family of products. Antunes Decl. ¶¶ 17-20. As further described in Section II.B.2, below, Valeant's debt burden, combined with its

---

[1] Medicis' assertion that Q-Med "invents a series of financial metrics" regarding Valeant's leverage, Opp. Mem. at 27, is belied by Valeant's own use of the exact same metrics when announcing the merger. *See* Antunes Decl. ¶ 12; Nicholson Decl. Ex. D, p.3.

conflict of interest as a direct competitor, could cause Valeant to have to cut back on the resource-intensive marketing efforts that are crucial to success and/or to choose which dermal filler product – its own Sculptra product or Q-Med's Restylane family – to prioritize. *See id.*

Medicis' contention – that Q-Med's concerns about Valeant's financial condition are belied by Galderma's consideration of a joint venture with Valeant – fails in light of the terms of the joint venture considered (which Medicis conspicuously does not describe). Galderma has never entertained any potential transaction that would involve Valeant having control over the marketing and sale of Q-Med products or that would involve any ongoing business entanglement that would make Valeant's financial condition relevant to Q-Med. *See id.* ¶¶ 22-25.

## II. Absent Injunctive Relief, Q-Med Will Suffer Irreparable Harm.[2]

### A. The Agreements Acknowledge That Q-Med Would Suffer Irreparable Harm.

Medicis does not dispute that the Agreements themselves contain the parties' express acknowledgment that non-compliance with the Agreements would result in irreparable harm.

---

[2] The Court may easily dispose of Medicis' primary argument – that Q-Med is contractually barred from seeking its injunction because the License Agreement "contemplate[s] such an injunction only in the case of an 'assignment.'" Opp. Mem. at 16. First, Medicis misreads the contract. Section 11.2 provides that an injunction may be sought "to prevent an assignment . . . in violation of Section 12.1." Hamid Decl. Ex. A, § 11.2. Section 12.1, in turn, is entitled "Assignments and Subleases" and describes transfers of rights that may occur in the event of a sublease or a change in control. Section 12.1 does not even use the word "assignment" anywhere in its text. Thus, the reference in Section 11.2 to "assignment[s] . . . in violation of Section 12.1," can only be read as referring to transfers in connection with a sublease or change in control transaction. Second, the Federal Arbitration Act gives the Court inherent authority to consider Q-Med's request for an injunction irrespective of any contractual language that purportedly limits its ability to do so. Courts entertain injunction applications even where mandatory arbitration clauses purport to prevent any recourse to the courts at all. *See, e.g., In re Faiveley Transport Malmo AB*, 522 F. Supp. 2d 639, 641 (S.D.N.Y. 2007), *rev'd on other grounds*, 559 F.3d 110 (2d Cir. 2009); *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 202, 207-08 (S.D.N.Y. 2000). Third, as Medicis concedes, Opp. Mem. at 16, n.6, the License Agreement expressly allows Q-Med to seek an injunction to prevent disclosure of confidential information. Q-Med seeks an injunction on those grounds as well. Finally, the statement in Section 11.2 that Q-Med "may" seek injunctive relief on two grounds is not, on its face, exclusive of other grounds.

8

Such contractual acknowledgments may be treated as an admission. *See* Pl. Mem. at 15-16 (citing cases). Even if they are not formally treated as an admission, they are an important factor that weighs in favor of finding irreparable harm. *See id.* The cases cited by Medicis do not suggest otherwise. *See Ardis Health, LLC v. Nankivell*, No. 11-cv-5013, 2011 WL 4965172, at *3 (S.D.N.Y. Oct. 19, 2011) (stating that a contract clause acknowledging that irreparable harm would result from breach was one factor to consider in the court's analysis); *Int'l Creative Mgmt, Inc. v. Abate*, No. 07-cv-1979, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007) (same).

### B. The Facts Demonstrate That Q-Med Would Suffer Irreparable Harm.

#### 1. Deprivation Of Contractual Consent Rights.

Medicis acknowledges, as it must, that under Second Circuit precedent, deprivation of consent rights constitutes irreparable harm – not on a *per se* basis, but where the consent rights play a "central" role in the balance of power negotiated between the parties. Opp. Mem. at 24 (citing *Wisdom Import Sales Co., LLC v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003)); *see also Empresas Cablevision, S.A.B de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 633 (S.D.N.Y. 2010), *aff'd* 381 F. App'x 117 (2d Cir. 2010).

The consent rights at issue here are central to the balance of power negotiated between the parties. Q-Med granted to Medicis exclusive authority over marketing and sale of Q-Med's most important products in the most important market in the world. The consent rights protect Q-Med from being forced, against its will, to deliver such exclusive control into the hands of a licensee that Q-Med reasonably determines meets certain limited criteria for unacceptability. Indeed, the *only* power Q-Med retained as to marketing and sale rights is its bargained-for power to control, to a limited degree, transfer of those rights. Deprivation of such consent rights would, therefore, constitute irreparable harm under the *Wisdom Import* and *Empresas* precedents of the Second Circuit.

9

Medicis attempts to minimize the importance of the consent rights by trying to characterize Q-Med as a mere manufacturer who has no interest in the marketing and sale of the products. Opp. Mem. at 24. Such a characterization is untenable in light of the undisputed facts. Q-Med distributes, markets and sells the Restylane family of products throughout the rest of the world. *See* Antunes Decl. ¶ 8. It has a deep concern about the marketing and sale of its products in North America both because of its economic interest in North American sales and because of the collateral impact on markets around the world. The U.S. accounts for about one-third of Q-Med's worldwide sales of the Restylane family, and doctors around the world look to the U.S. market for thought and opinion leadership. If Q-Med's products decline in the U.S., they will undoubtedly decline around the world as well. Sales of the Restylane family of products account for 80% of Q-Med's total revenues. *Id.* ¶¶ 8-10.

Medicis also concedes, as it must, that deprivation of consent rights would constitute irreparable harm where such consent rights serve to prevent confidential information from being delivered into the hands of a competitor. *See* Opp. Mem. at 25 (*citing Empresas*, 680 F. Supp. 2d at 632). Although Medicis contends that Valeant is not a competitor and that no confidential information would pass to Valeant, those positions are untenable for the reasons described in Sections I.A, B and C, and II.B.3, respectively.

> **2.     Loss Of Good Will, Reputation And Market Share.**

Medicis contends that Q-Med's concerns about loss of good will, reputation and market share are based on a failure to appreciate that under the proposed structure of the acquisition of Medicis by Valeant, which is a so-called reverse triangular merger, Medicis will continue in existence as an indirect, wholly owned subsidiary of Valeant. Opp. Mem. at 18; Schiller Decl. ¶ 6. This argument puts form dramatically over substance. The Medicis entities would remain, but they would now be wholly-owned subsidiaries of Valeant under Valeant's control. On

10

information and belief, they would also be required to guarantee Valeant's enormous debt load. Valeant acknowledges, moreover, that the post-merger sales force would market both Restylane and Sculptra, Schiller Decl. ¶ 17, meaning that the Medicis entities would go from carrying only one dermal filler to having an inherent conflict of interest. Antunes Decl. ¶ 21.[3]

Medicis also argues that it "defies common sense" to be concerned that Valeant would acquire Medicis and then not market Medicis' products effectively. Opp. Mem. at 18-19; Schiller Decl. ¶¶ 6, 17. In fact, it makes perfect sense. The Restylane family of products will be a tiny component of Valeant's portfolio. It currently accounts for only 10% of Medicis' revenues, *see* Shacknai Decl. ¶ 4, and will account for a much smaller percentage of Valeant's post-merger revenues. According to Valeant, the current Medicis product portfolio includes only 26 products, including only one dermal filler brand, while the Valeant product portfolio consists of more than 900 products. *See* Schiller Decl. ¶ 12. Thus, it is not at all irrational to conclude that Valeant would not give Restylane products the same level of un-conflicted care and attention that they have received from Medicis. Antunes Decl. ¶¶ 17-20; Reply Langö Decl. ¶¶ 20-21.

Given Valeant's overwhelming debt burden, even a modest decline in performance or other adverse developments could cause Valeant to cut back on the resource-intensive marketing and physician education efforts that are crucial to success in the dermal filler market. Without sustained investment in marketing, training and education, Q-Med's products will quickly lose their reputation, good will and market share to competitive products. *See* Antunes Decl. ¶ 17.

The risk of irreparable harm is all the more acute because Valeant markets and sells its own competitive dermal filler products, including Sculptra. Valeant will have every incentive to

---

[3] But Medicis cannot assert expressly that the structure of the merger circumvents Q-Med's consent rights, as such circumvention would be a clear breach of Medicis' implied covenant of good faith and fair dealing. *See Empresas Cablevision*, 680 F. Supp. 2d at 631.

favor its own competing products (for which it presumably receives all of the economic benefits) over Q-Med's products (as to which Valeant must share the economic benefits with Q-Med). Valeant's conflict of interest will be a particularly acute problem for Q-Med's products if, because of its overwhelming debt burden, Valeant becomes resource-constrained and is forced to make choices about which products to prioritize and which to de-prioritize.  *Id.* ¶ 20.[4]

### 3. Disclosure Of Confidential Information To A Competitor.

Medicis' contention – that Q-Med's concerns about confidential information are merely conclusory – ignores the Declaration of Per Langö submitted with Q-Med's initial moving papers, which detailed both the contractual obligations that would require Q-Med to share confidential information with Valeant, as it has with Medicis for nearly ten years, and the categories of confidential information that would be covered by that obligation.  Langö Decl. ¶¶ 33-35.  Medicis fails to dispute any of the contentions about confidential information set forth in Mr. Langö's initial declaration.

Instead, Medicis relies on the declaration of Dr. Wortzman, who serves on the Q-Med/Medicis Joint Steering Committee with Mr. Langö, and who, quite conspicuously, side steps the real issue by carefully limiting his testimony only to "manufacturing" information.  Dr. Wortzman's declaration states that Medicis "does not have, nor has it ever had, access to Q-Med's formulation and/or manufacturing trade secrets."  Wortzman Decl. ¶¶ 26-27.  Dr. Wortzman's assertions are beside the point.

As detailed in Mr. Langö's initial declaration, the confidential and trade secret information that would be disclosed to Valeant under the terms of Q-Med's contracts with

---

[4] Medicis attempts to recast Q-Med's concern as "potential loss of profits," which, in its view, does not constitute irreparable harm.  Opp. Mem. at 19.  While Q-Med would be harmed by any loss of profits, its irreparable harm lies in the loss of Restylane's good will, reputation and market share.  *See* Pl. Mem. at 18-19 (citing cases).

Medicis, and as a result of Valeant gaining control over Medicis, relates primarily to sales, marketing and business development matters, not manufacturing.  *See* Langö Decl. ¶¶ 33-34. Notably, Dr. Wortzman does not dispute Mr. Langö's contentions that such confidential information is shared with Medicis or that Q-Med would have an obligation to continue to share such information post-merger with Valeant.

Dr. Wortzman and Medicis also do not – and cannot – dispute that disclosure of such information would give Valeant an unfair competitive advantage.  Access to Q-Med's confidential information about Q-Med's possible future improvements and line extensions, its international marketing tactics, industry feedback it has received, and negative reactions to the Restylane family of products, would all be of obvious value to Valeant in marketing its competitive products.

### 4. Q-Med Would Be Prevented From Introducing New Products.

Medicis does not dispute that if Q-Med were to develop any new dermal filler products, it would be obligated to grant Valeant exclusive rights to market and sell those new products in North America as well.  As Medicis correctly notes, Q-Med's argument – that this obligation would effectively prevent Q-Med from introducing new products – rests on "Q-Med's premise that Valeant is a direct competitor and an unsuitable business partner." Opp. Mem. at 22.  As described in Section I, above, Q-Med's premise is sound.

### III. Q-Med Also Meets The Alternative Standard For A Preliminary Injunction.

Q-Med is also entitled to a preliminary injunction because it can show that serious questions exist going to the merits of the case that are fair ground for litigation and that the balance of the hardships tips in its favor.  Medicis' principal response is that the balance of the equities weighs against an injunction.  Opp. Mem. at 32.  The Court need not reach this argument

13

because, as shown above, Q-Med is likely to succeed on the merits, and the balance of the hardships is only relevant to the alternative standard for an injunction. *See Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

Medicis asserts that Q-Med is not entitled to a preliminary injunction under the alternative standard because an injunction "would irreparably harm Medicis and its shareholders." Opp. Mem. at 32. Medicis' shareholders are not a party to the Valeant merger agreement and, as such, the agreement confers no rights on Medicis' shareholders related to Q-Med's dispute with Medicis. *See Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 527, 531 (2d Cir. 2005) (holding shareholders' rights under merger agreement limited to those specifically expressed in agreement language); *see also* Hamid Decl. Ex. E, § 9.8 ("No Third Party Beneficiaries"). Medicis asserts that, if the merger is delayed by an injunction, Medicis itself will suffer harm in the form of employees departing their jobs and restrictions on Medicis' freedom to operate in the "pre-closing period." Opp. Mem. at 32. An injunction, however, should not delay the merger at all beyond the timeline that Medicis, its employees and the rest of the market have already been led to expect. Valeant publicly announced to the market that the merger would close in "the first half of 2013." Hamid Decl. Ex. I. Q-Med filed its Request for Arbitration with the ICC on November 16, 2012. Thus, the parties should be able to receive a final determination on the merits of the arbitration within the timeframe that was already expected before Q-Med commenced this action.[5]

---

[5] For similar reasons, Medicis' request for an outsize bond is meritless: the lost premium to shareholders is not a recoverable loss that should be covered by the bond, and the only real potential loss – time value of money – is *de minimus* given that an injunction should not affect the timing for closing already announced by Valeant to the market. *See In re Del Monte Foods Co. Shareholders Litig.*, 25 A.3d 813, 843-44 (Del. Ct. Ch. 2011).

**Conclusion**

For the foregoing reasons, and those set forth in its initial moving papers, Q-Med respectfully requests that this Court grant its application for a preliminarily injunction.

Dated: New York, New York
       November 21, 2012

                         Respectfully submitted,
                         DEBEVOISE & PLIMPTON LLP

                         By: /s/ *Jyotin Hamid*
                            Jyotin Hamid (jhamid@debevoise.com)
                            Jeremy N. Klatell (jklatell@debevoise.com)
                            Sok T. Tea (stea@debevoise.com)
                         919 Third Avenue
                         New York, New York 10022
                         (212) 909-1031
                         *Attorneys for Plaintiff Q-Med AB*