UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Q-MED AB,                                       :
                                                :
          Plaintiff,                            :
                                                :          12 Civ. 8071 (RJS)
                  vs.                           :
                                                :
HA NORTH AMERICAN SALES AB,                     :
MEDICIS AESTHETICS HOLDINGS INC., and           :
MEDICIS PHARMACEUTICAL CORP.,                   :
                                                :
          Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF HUMBERTO C. ANTUNES

I, Humberto C. Antunes, hereby declare as follows:

1.      I am the Chief Executive Officer of Plaintiff Q-Med AB ("Q-Med") and

Managing Director of its parent company, Galderma Pharma SA ("Galderma"). I submit this

declaration, on personal knowledge, and, where indicated, on information and belief, in support

of Q-Med's motion for a preliminary injunction against HA North American Sales AB, Medicis

Aesthetics Holdings Inc. and Medicis Pharmaceutical Corp. (collectively, "Medicis"). In

particular, I respond to certain arguments made by Medicis in papers submitted to the Court,

including in the declarations of J. Michael Pearson and Howard B. Schiller of Valeant

Pharmaceuticals International, Inc. ("Valeant"), and Jonah Shacknai of Medicis.

### Overview

2.      Q-Med brought this motion to prevent the exclusive rights to market and sell its

most important products from being transferred improperly to Valeant – a company which we

consider to be a patently unacceptable exclusive licensee of our products, both because it

markets and sells its own directly competitive products and because of its financial condition.



3.    I understand that in papers submitted to the Court, Medicis contends that our concerns about being forced, against our will, into an exclusive license arrangement with Valeant are "pretextual" and inconsistent with discussions I have had with Valeant about potential business transactions. That contention is inaccurate and is based on a misleadingly incomplete description of the discussions I have had with Valeant.

4.    In fact, as explained below, Q-Med and Galderma have never taken any action inconsistent with our firm conviction – which motivates this litigation – that our products would be irreparably harmed if they were to fall into the hands of Valeant. When I learned, in early September 2012, of the proposed acquisition of Medicis by Valeant, I immediately became concerned for the future health and strength of Q-Med's premier dermal filler products. All of my actions since have been aimed at protecting the products and Q-Med from irreparable harm.

5.    It is true that I am open to means of protecting the products besides litigation. While commencing this litigation to prevent irreparable harm, I have also explored potential business resolutions to protect the products from such harm. I have explored and expressed my support towards the possibility of buying the aesthetics assets from Valeant post-merger. As an alternative to a straightforward purchase of the assets, at Valeant's suggestion, I have also said that we would consider the possibility of a North American joint venture. But under the joint venture structure proposed by Valeant, Galderma would be majority owner and have total operational control, Valeant would merely contribute its aesthetics assets, and Galderma would control the sale and marketing of such products.

6.    The bottom line is that I have never countenanced or discussed any scenario remotely similar to the one that would be forced upon us against our will absent injunctive relief – that is, exclusive control over marketing and sale of our products passing into Valeant's hands.



2

It is my firm conviction that such a scenario would cause irreparable harm. I have never proposed or entertained any potential business transaction that would involve a highly leveraged competitor such as Valeant having control over the marketing and sale of our products. Nor have I ever proposed or entertained any transaction where Valeant's financial condition would have created risk for Q-Med or Galderma.

7.      Medicis is, therefore, simply wrong to suggest that I have ever proposed a business transaction that is inconsistent with our firm conviction that irreparable harm would result if exclusive control over marketing and sale of our products were to pass into Valeant's hands. Given the expense, uncertainties and distractions inherent in the litigation process, I have behaved responsibly in trying to explore business resolutions that would address our legitimate concerns. My actions in this regard thus hardly constitute "unclean hands" and are in no way inconsistent with the positions we are taking in this litigation.

## The Importance of the Restylane Family to Q-Med and Galderma

8.      The Restylane family of products is of critical importance to Q-Med and Galderma. Q-Med is not a mere manufacturer. We continue to research, invent and develop new medical solutions using the technology underlying Restylane to meet the needs of patients. Although Medicis currently has the exclusive rights to market and sell the Restylane family in North America, Q-Med distributes, markets and sells the Restylane family of products throughout the rest of the world. We are deeply concerned about the strength of our products in North America both because of our economic interest in North American sales and because of the collateral impact on markets around the world. The U.S. accounts for about one-third of our worldwide sales of the Restylane family, and doctors around the world look to the U.S. market



3

for thought and opinion leadership. If our products decline in the U.S. that will undoubtedly negatively influence the development of our products around the world as well.

9.      The Restylane family of products is not only of critical strategic importance to Q-Med but also to Galderma's overall strategy for its Aesthetic and Corrective business. Galderma is organized into three businesses focused exclusively on dermatology: the prescription (Rx) business; the self-medication (OTC) business; and the Aesthetic and Corrective business.

10.     In 2011, the Restylane family of products accounted for $130.6 million in worldwide revenue, representing 80% of Q-Med's total revenue and 39% of the total revenue of Galderma's Aesthetic and Corrective business. We also believe the products have great potential for future growth in North America and around the world, and we forecast these products, and the underlying technology, to represent an increasing proportion of sales and profits in the future. Mr. Shacknai is correct that, prior to the announcement of the proposed merger with Valeant and the present controversy, I have often expressed interest in purchasing Medicis' rights with respect to the products in North America.

### Irreparable Harm Would Result If Exclusive Control Over Marketing And Sale Of The Products In North America Were To Pass Into Valeant's Hands

11.     One reason that irreparable harm would result if exclusive control over marketing and sale of the Restylane family of products in North America were to pass into Valeant's hands is that Valeant's financial condition is highly leveraged. A declaration submitted to the Court by my colleague, Peter Nicholson, details Valeant's high debt and leverage and weak credit ratings assigned by the independent rating agencies and the reasons that these issues would prevent Valeant from providing the same level of attention and focus to Q-Med's products that Medicis currently devotes to them or that is required to sustain their position in the market. I do not



4

attempt here to repeat what Mr. Nicholson has explained. Rather, I respond to points on this issue raised by Medicis and Valeant in Medicis' opposition papers.

12.     As a threshold matter, I am surprised by Medicis' untenable assertion that the debt to EBITDA ratios that drive much of our analysis of Valeant's financial condition is a metric that Q-Med "invented." *See* Opp. Mem. at 27. This is a blatant mischaracterization. As Medicis surely knows, such ratios are an extremely common metric to use in evaluating a company's financial condition. In my understanding, they are central to the rating agencies' conclusions about companies' creditworthiness generally and Valeant's weak ratings in particular. I note that even Valeant's CEO, Mr. Pearson, addressed Valeant's debt to EBITDA ratio at the very beginning of his comments to investors and analysts immediately following the announcement of the proposed acquisition of Medicis. *See* Nicholson Decl. Ex. D, p.3. Reflecting his recognition that this is a key metric of importance to the financial community (and that Valeant's ratio currently is uncomfortably high), he committed to bringing the ratio below 4x.

13.     In discussing Valeant's financial condition, Valeant and Medicis seem to have ignored entirely our primary concern about Valeant's financial condition: Valeant's levels of debt and leverage. Their response focuses exclusively on the fact that Valeant is considerably larger than Medicis. *See, e.g.,* Schiller Decl. ¶¶ 7-9.

14.     Bigger, however, is not necessarily better. Very large companies fail. Companies, large or small, with high leverage fail more often than companies with less debt because such companies' high leverage can become a major burden and limitation on flexibility should one or more adverse events occur. This is particularly true in the pharmaceutical industry where the risks of significant adverse events, such as the emergence of generic competition or an inability to replace products protected by expiring patents, are heightened. A recent example



5

was the bankruptcy of Graceway Pharmaceuticals, which resulted primarily from a single product becoming subject to generic competition and the company no longer being able to service its substantial debt load due to declining revenues (a situation Medicis knows well, as it participated in the bankruptcy auction last Fall). Such high risks in this industry explain why most major pharmaceutical companies have chosen to maintain very low leverage levels – on average half that of Valeant. *See* Nicholson Decl. ¶ 17. Indeed, neither Galderma nor Medicis have any meaningful debt outstanding despite very successful and long-standing operations.

15.     For these reasons, in selecting a party to assume exclusive control over marketing and sale of our key products in the most important market in the world, Q-Med is much more concerned with the licensee's leverage than with its size.

16.     Mr. Schiller asserts that Valeant's size ensures that it will easily be able to make the estimated $20 million in annual payments owed under the agreements with Q-Med. *See* Schiller Decl. ¶ 9. That assertion is both incorrect and beside the point. It is incorrect because it ignores the fundamental import of Valeant's weak credit ratings – i.e., a significant risk that Valeant may be unable to comply with its debt obligations, leading ultimately to financial failure. In such a scenario, Q-Med, an unsecured creditor, would be unlikely to be paid at all. (For this reason, we take no comfort in Mr. Schiller's observation, *see* Schiller Decl. ¶ 10, that senior lenders were willing to extend Valeant additional credit.) Q-Med is entitled to be paid not only this year and next, but for the full 100-year term of the license agreements. The simple fact is that Valeant's credit ratings are drastically weaker than the industry average, putting the company in the "speculative and high credit risk" category rather than the "investment grade" category in which most of its peers reside.

6

17.     More important, Valeant's focus on the estimated $20 million annual payment obligation misses our primary concern – that Valeant will not have the wherewithal to make the significant financial investment in marketing, medical education and physician training necessary to maintain the market position of the Restylane family of products. Given Valeant's overwhelming debt burden, even a modest decline in performance or other adverse developments could cause Valeant to have to cut back on the resource-intensive marketing and physician education efforts that are crucial to success in the dermal filler market. Without sustained investment in marketing, training and education, Q-Med's products will quickly lose their reputation, good will and market share to competitive products. That harm, unlike a missed $20 million payment, would be irreparable.

18.     Q-Med and its financial advisors are not the only ones to observe that Valeant's high leverage and debt-fueled acquisition strategy cast serious doubt on its ability to invest adequately in marketing and sales of the products it acquires. For example, in an article entitled "Valeant, an Aggressive Buyer of Drug Companies, Acquires Its Way to Mediocrity," CBS MoneyWatch reported that "the bigger Valeant gets, the less successful it seems to be at sales." http://www.cbsnews.com/8301-505123_162-42848797/valeant-an-aggressive-buyer-of-drug-companies-acquires-its-way-to-mediocrity/?tag=bnetdomain. On information and belief, Morgan Stanley downgraded its rating on Valeant just after the proposed Medicis acquisition was announced.

19.     Valeant's need to service debt will also take priority over research and development aimed at any product enhancements and line extensions. Indeed, Valeant's CEO has been very open in conversations with me, as well as in public statements, that Valeant does not believe in investing in research and development. The Restylane family will not stay

7



competitive if our exclusive licensee in the most important market in the world is not committed to continuous product enhancement.

20. The risk of irreparable harm is all the more acute because Valeant markets and sells its own competitive dermal filler products, including Sculptra, as more fully explained in the declarations submitted to the Court by my colleague, Per Langö. Valeant will have every incentive to favor its own competing dermal filler products (for which it presumably receives all of the economic benefits) over Q-Med's products (as to which Valeant must share the economic benefits with Q-Med). Valeant's conflict of interest will be a particularly acute problem for our products if, because of its overwhelming debt burden, Valeant becomes resource-constrained and is forced to make choices about which products to prioritize and which to de-prioritize.

21. I understand Mr. Schiller to argue that our concerns "ignore[] that, under the proposed transaction structure, which is a so-called reverse triangular merger, Medicis will continue in existence as an indirect, wholly owned subsidiary of Valeant." Schiller Decl. ¶ 6. Mr. Schiller's point puts form dramatically over substance. The Medicis entities would remain, but they would now be wholly-owned subsidiaries of Valeant under Valeant's control. On information and belief, they would also be required to guarantee Valeant's enormous debt load. Mr. Schiller acknowledges, moreover, that the post-merger sales force would market both Restylane and Sculptra, *id.* ¶ 17, meaning that the Medicis entities would go from carrying only one dermal filler to having an inherent conflict of interest.

## Proposed Transactions with Valeant

22. Mr. Pearson is correct that I have had certain conversations with him, both before and after the proposed acquisition of Medicis by Valeant was announced, about the possibility of Galderma engaging in some form of business transaction with Valeant concerning Medicis'

8



aesthetics business. Mr. Pearson is also correct that in these discussions I have never raised any concerns about Valeant's financial condition.

23.     What Mr. Pearson conspicuously leaves out, however, is the fact that none of the proposed transactions that I have discussed with him would have involved Valeant having control over marketing and sale of our products or any other ongoing business entanglement in which Valeant's financial condition would have been relevant. I therefore would have had no reason to express a view about Valeant's financial condition. A buyer of assets, for example, has little reason to care about the going-forward financial condition of the seller.

24.     As Mr. Pearson notes, I had a discussion with him in August 2012. *See* Pearson Decl. ¶¶ 6-7. In his declaration, however, Mr. Pearson conspicuously leaves out the material terms of the potential transaction that was discussed. Mr. Pearson proposed a joint venture as an alternative to a straightforward sale of assets to Galderma. Critically, the material terms of the joint venture structure he proposed included: (1) that Galderma would be the majority owner and have full operational control, (2) that Valeant's role would be essentially to contribute assets, and (3) that Galderma would have control over marketing and sale of the assets. Although I told Mr. Pearson that I would prefer a straightforward purchase of assets, I would consider his joint venture proposal as an alternative way of protecting our products.

25.     Mr. Pearson is also correct that after the proposed acquisition of Medicis by Valeant was announced in September, I had renewed discussions with him about possible transactions between Valeant and Galderma. *See id.* ¶¶ 9-12. He is also right that one proposal we discussed (my preferred approach) would involve Galderma simply buying the Medicis aesthetics business from Valeant post-merger. Although we also agreed to consider a joint venture structure, as Mr. Pearson notes, he again leaves out the salient details – that under his

9

proposed structure, Galderma would be the majority owner, Valeant would be essentially a passive contributor of assets and Galderma would have control over marketing and sale.

26.     Mr. Pearson indicates that, in conversations with him, I have described Sculptra as a "niche" product. *See* Pearson Decl. ¶ 7. I do not recall using that word. I have told Mr. Pearson that I believe Restylane is far superior to Sculptra. I have never said that I do not think Sculptra and Restylane compete directly.

27.     Finally, Mr. Pearson is correct that, after Q-Med filed the present lawsuit, I spoke with him again and indicated that I would prefer to find a business resolution to this dispute. *See* Pearson Decl. ¶ 14. Indeed, I would prefer a business resolution. He expressed the same preference to me, too, on several occasions, but would never engage in good faith negotiations. My preference for a business resolution is in no way inconsistent with our aims in the litigation – to prevent irreparable harm to the Restylane products and Q-Med. Whether it is through litigation or otherwise, we seek to prevent the irreparable harm that would result if exclusive control over marketing and sale of the Restylane products were to pass into Valeant's hands.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Paris, France on this 20 day of November, 2012.

Humberto C. Antunes

10

23782214